## PILLSBURY CO. ET AL. *v.* CONBOY

No. 81–825.   Argued October 6, 1982—Decided January 11, 1983

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, MARSHALL, and REHNQUIST, JJ., joined. MARSHALL, J., filed a concurring opinion, *post*, p. 264. BRENNAN, J., *post*, p. 271, and BLACKMUN, J., *post*, p. 272, filed opinions concurring in the judgment. STEVENS, J., filed a dissenting opinion, in which O'CONNOR, J., joined, *post*, p. 282.

*Francis J. McConnell* argued the cause for petitioners. With him on the briefs was *Edward F. Ruberry*.

*Michael W. Coffield* argued the cause for respondent. With him on the brief was *Kevin M. Flynn*.*

JUSTICE POWELL delivered the opinion of the Court.

Pursuant to the federal use immunity provisions, 18 U. S. C. §§ 6001–6005, a United States Attorney may request an order from a federal court compelling a witness to testify even though he has asserted his privilege against self-incrimination. Section 6002 provides, however, that "no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case . . . ." The issue presented in this case is whether a deponent's civil deposition testimony, repeating

---

*Jerry G. Hill* and *Frank V. Ghiselli, Jr.*, filed a brief for Philip L. Barnum et al. as *amici curiae* urging affirmance.

*Harold F. Baker, Alan Wiseman,* and *Ann I. Killilea* filed a brief for Mead Corp. as *amicus curiae.*

verbatim or closely tracking his prior immunized testimony, is immunized "testimony" that can be compelled over the valid assertion of his Fifth Amendment privilege.

I

Respondent John Conboy is a former executive of a defendant in *In re Corrugated Container Antitrust Litigation*, M. D. L. 310 (SD Tex.). In January 1978, United States Department of Justice attorneys interviewed Conboy following a promise of use immunity. Conboy subsequently appeared before a grand jury investigating price-fixing activities and, pursuant to 18 U. S. C. § 6002, was granted formal use immunity for his testimony.

Following the criminal indictment of several companies, numerous civil antitrust actions were filed in various United States District Courts. Those actions were consolidated for discovery in the District Court for the Southern District of Texas. Petitioners here are purchasers of corrugated containers who elected to opt out of the class-action proceedings and pursue their own causes of action against manufacturers. The District Court ordered that portions of the immunized Government interview and grand jury testimony of certain witnesses, including that of Conboy, be made available to lawyers for the class and opt-outs.[1]

Pursuant to a subpoena issued by the District Court for the Northern District of Illinois, Conboy appeared in Chicago for a deposition at which he, his counsel, and petitioners' counsel had copies of his immunized testimony. The transcripts were marked as deposition exhibits so that all could follow the intended examination. The questioning fell into the following pattern: a question was read from the transcript; it then was rephrased to include the transcript answer (*i. e.,*

---

[1] The propriety of the District Court's release of grand jury materials to the civil parties is not before the Court.

"Is it not the fact that . . ."); finally, Conboy was asked if he had "so testif[ied]" in his immunized interview and grand jury examination.[2]   Conboy refused to answer each question, asserting his Fifth Amendment privilege against self-incrimination.

The District Court granted petitioners' motion to compel Conboy to answer the questions.[3]   When Conboy continued to claim his privilege, the District Court held him in contempt, but stayed its order pending appeal.   A panel of the Court of Appeals for the Seventh Circuit affirmed the contempt order, holding that, "[b]ecause the questions asked in this deposition were taken verbatim from or closely tracked the transcript of Conboy's grand jury testimony, we believe that his answers at the deposition would be 'derived from' the prior immunized [testimony] and therefore unavailable for use in any subsequent criminal prosecution." *In re Corrugated Container Antitrust Litigation, Appeal of Conboy,* 655 F. 2d 748, 751 (1981).

On rehearing en banc, the Court of Appeals reversed the District Court.   661 F. 2d 1145 (1981).   It first determined that Conboy's alleged fear of prosecution was more than "fanciful," *id.,* at 1152, and that Conboy therefore was entitled to assert his Fifth Amendment privilege unless his deposition

---

[2] An example of this three-question pattern is as follows:

"Q. Who did you have price communications with at Alton Box Board?

.　　　　　.　　　　　.　　　　　.　　　　　.

"Q. Is it not the fact that you had price communications with Fred Renshaw and Dick Herman . . . ?

.　　　　　.　　　　　.　　　　　.　　　　　.

"Q. Did you not so testify in your government interview statement of January 10, 1978?"   App. 29–31.

[3] Chief Judge John V. Singleton, Jr., of the District Court for the Southern District of Texas expressly exercised the powers of the District Court for the Northern District of Illinois pursuant to 28 U. S. C. § 1407(b).   The contempt hearing was conducted by telephone with his chambers in Houston.

testimony could not be used against him in a subsequent criminal action, see *id.*, at 1153.[4]  The court then held that under § 6002, absent a separate and independent grant of immunity,[5] a deponent's civil deposition testimony that repeats verbatim or closely tracks his prior immunized testimony is not protected.  While acknowledging that verbatim questions "of course [would be] derived" from the immunized testimony, the court reasoned that the answers to such questions "are derived from the deponent's *current*, independent memory of events" and thus "necessarily create a *new* source of evidence" that could be used in a subsequent criminal prosecution against Conboy.  *Id.*, at 1155 (emphasis in original).

We granted certiorari to resolve the conflict in the Courts of Appeals,[6] 454 U. S. 1141 (1982), and now affirm.

## II

It is settled that government must have the power to compel testimony "to secure information necessary for effective law enforcement."  *Murphy* v. *Waterfront Comm'n*, 378 U. S. 52, 79 (1964).[7]  For many years, however, a person who was compelled to testify under a grant of governmental

---

[4] The correctness of the Court of Appeals' conclusion that Conboy could assert a Fifth Amendment privilege, absent some immunity, is not before us.

[5] A United States Attorney declined to authorize immunity grants in connection with the civil depositions here.

[6] Compare *In re Corrugated Container Antitrust Litigation, Appeal of Fleischacker*, 644 F. 2d 70, 75 (CA2 1981) (deposition answers immunized), and *Little Rock School District* v. *Borden, Inc.*, 632 F. 2d 700, 705 (CA8 1980) (same), with *In re Corrugated Container Anti-Trust Litigation, Appeal of Franey*, 620 F. 2d 1086, 1095 (CA5 1980) (answers not immunized), cert. denied, 449 U. S. 1102 (1981).

[7] *See United States* v. *Calandra*, 414 U. S. 338, 345 (1974); *United States* v. *Mara*, 410 U. S. 19, 41 (1973) (MARSHALL, J., dissenting); *Kastigar* v. *United States*, 406 U. S. 441, 443–444 (1972); *Murphy*, 378 U. S., at 93–94 (WHITE, J., concurring); *Blackmer* v. *United States*, 284 U. S. 421, 438 (1932); *Blair* v. *United States*, 250 U. S. 273, 281 (1919); *Brown* v. *Walker*, 161 U. S. 591, 600 (1896).

immunity could not be prosecuted for any conduct about which he had testified. See *New Jersey* v. *Portash*, 440 U. S. 450, 457 (1979). Prosecutors therefore were reluctant to grant such "transactional" immunity to potential targets of criminal investigations. See S. Rep. No. 91–617, p. 53 (1969).

The "major purpose" of the Organized Crime Control Act of 1970, Pub. L. 91–452, 84 Stat. 922, of which § 6002 was a key provision, was "to provide the criminal justice system with the necessary legal tools to . . . strengthe[n] the evidence gathering process and insur[e] that the evidence will then be available and admissible at trial." 116 Cong. Rec. 35200 (1970) (statement of Rep. St Germain). Congress sought to make the grant of immunity more useful for law enforcement officers through two specific changes. First, Congress made the grant of immunity less expansive[8] by repealing the authority for transactional immunity and providing for the less comprehensive use immunity authorized in § 6002.[9] Second, Congress gave certain officials in

---

[8] In *Murphy*, JUSTICE WHITE stated that "[i]mmunity must be as broad as, but not harmfully and wastefully broader than, the privilege against self-incrimination." 378 U. S., at 107 (concurring opinion) (quoted with approval in 116 Cong. Rec. 35291 (1970) (statement of Rep. Poff)). In its Committee Report, the House explained that § 6002 was not to provide an "immunity bath," but was to be "no broader than" the Fifth Amendment privilege. H. R. Rep. No. 91–1549, p. 42 (1970).

[9] Section 6002 provides:

"Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—

"(1) a court or grand jury of the United States,

"(2) an agency of the United States, or

"(3) either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee of either House

and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information

the Department of Justice[10] exclusive authority to grant immunities.[11]

The Court upheld the constitutionality of the use immunity statute in *Kastigar* v. *United States*, 406 U. S. 441 (1972). The power to compel testimony is limited by the Fifth Amendment, and we held that any grant of immunity must be coextensive with the privilege. We were satisfied, how-

---

directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order."

Section 6001(2) defines "other information" to include "any book, paper, document, record, recording, or other material."

[10] Section 6003 states:

"(a) In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a court of the United States or a grand jury of the United States, the United States district court for the judicial district in which the proceeding is or may be held shall issue, in accordance with subsection (b) of this section, upon the request of the United States attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in section 6002 of this part.

"(b) A United States attorney may, with the approval of the Attorney General, the Deputy Attorney General, or any designated Assistant Attorney General, request an order under subsection (a) of this section when in his judgment—

"(1) the testimony or other information from such individual may be necessary to the public interest; and

"(2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination."

[11] Congress foresaw the courts as playing only a minor role in the immunizing process: "The court's role in granting the order is merely to find the facts on which the order is predicated." H. R. Rep. No. 91–1549, *supra*, at 43; H. R. Rep. No. 91–1188, p. 13 (1970). See 116 Cong. Rec. 35291 (1970) (statement of Rep. Poff). Cf. President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 141 (1967) (recommending that "[i]mmunity should be granted only with the prior approval of the jurisdiction's chief prosecuting officer").

ever, that § 6002 provided this measure of protection and thus "removed the dangers against which the privilege protects." *Id.*, at 449. In rejecting the argument that use and derivative-use immunity would not adequately protect a witness from various incriminating uses of the compelled testimony, we emphasized that "[t]he statute provides a sweeping proscription of any use, direct or indirect, of the compelled testimony and any information derived therefrom . . . ." *Id.*, at 460. We added that once a defendant establishes that he has testified under a grant of immunity, "the prosecution [has] the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Ibid.* Thus, "immunity from use and derivative use 'leaves the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege' in the absence of a grant of immunity." *Id.*, at 458–459 (quoting *Murphy*, 378 U. S., at 79).

## III

With the foregoing statutory history and relevant principles in mind, we turn now to this case. It is not disputed that the *questions* asked of Conboy were directly or indirectly derived from his immunized testimony. The issue as presented to us is whether the causal connection between the questions and the answers is so direct that the *answers* also are derived from that testimony and therefore should be excluded under the grant of immunity.

Petitioners' argument is based on the language of § 6002 and on a common understanding of the words "derived from." The questions formulated on the basis of immunized testimony are clearly "derived from" the prior testimony. Thus, the answers that repeat verbatim or closely track a deponent's testimony are necessarily also "derived from" and "tainted by" such testimony. Petitioners therefore find no basis for the distinction made by the Court of Appeals between questions and answers responsive to those same ques-

tions. An answer by its very nature is evoked by and responds to information contained in a question.

Conboy's position is also straightforward: Questions do not incriminate; answers do. Unlike the questions, answers are not directly or indirectly derived from the immunized grand jury or interview transcripts, but from the deponent's current, independent memory of events. Even when a deponent's deposition answers are identical to those he gave to the grand jury, he is under oath to tell the truth, not necessarily as he told it before the grand jury, but as he knows it now. Each new statement of the deponent creates a new "source." In sum, the initial grant of immunity does not prevent the prosecutor from prosecuting; it merely limits his sources of evidence.

Although the parties make their arguments in terms tracking those of the statute—whether the deposition testimony is "derived from" the prior testimony—it is clear that the crux of their dispute is whether the earlier grant of immunity itself compelled Conboy to talk.[12] Petitioners contend that the prior grant of immunity *already* had supplanted Conboy's Fifth Amendment privilege at the time of the civil deposition. Petitioners would limit this immunity, of course, to testimony that "closely tracks" his prior immunized testimony. It is argued that this would not threaten the Government's need for admissible evidence or the individual's interest in avoiding self-incrimination. In the absence of such a threat, admissible evidence should be available to civil antitrust plaintiffs. But we cannot accept the assumptions upon which petitioners' conclusion rests. In our view, a District Court cannot compel Conboy to answer deposition questions over a

---

[12] See Brief for Petitioners 9 ("Conboy had no Fifth Amendment privilege to assert because of the coextensive protection provided by the immunity statute"); Reply Brief for Petitioners 12 ("[R]equiring a witness to answer questions a second time that were previously answered under a grant of immunity does not result in an expansion of the original immunity grant").

valid assertion of his Fifth Amendment right, absent a duly authorized assurance of immunity at the time.[13]

We note at the outset that although there may be practical reasons for not testifying,[14] as far as the deponent's Fifth Amendment right is concerned he should be indifferent between the protection afforded by silence and that afforded by immunity. A deponent's primary interest is that the protection be certain. The Government's interest, however, may be affected seriously by whether the deponent relies at the civil deposition on his Fifth Amendment privilege or on his prior grant of immunity. With due recognition of petition-

---

[13] JUSTICE BLACKMUN, concurring in the Court's judgment, assumes that Conboy had a *right* to remain silent at the deposition, which by definition assumes the immunity order itself does not compel a witness to testify at a civil deposition. He discusses the "fruits" doctrine where a witness' testimony at a deposition is "an independent act of free will" and concludes that "had Conboy answered the deposition questions, his testimony would not have been protected by the original immunity grant . . . ." *Post*, at 280. We have no occasion to address this hypothetical. The issue is whether Conboy can be compelled to testify—*i. e.*, whether the immunity order compels him to track his prior testimony at the civil deposition—over the assertion of his Fifth Amendment rights. If, as we conclude, the original grant of immunity does not extend to the subsequent civil proceeding, then the trial judge lacks authority to compel Conboy to testify over the assertion of his Fifth Amendment privilege. This is so irrespective of whether, had he testified at the deposition rather than asserting the privilege, his answers could have been admitted against him at a criminal trial. We therefore need not now decide the extent to which civil deposition testimony, freely given by a witness in Conboy's position, is "directly or indirectly derived" from prior grand jury testimony.

As JUSTICE BLACKMUN's opinion makes a factual analysis under the "fruits" doctrine, it appears to leave open the possibility that the outcome in a subsequent criminal prosecution of the deponent may be different in a future case because of differences in the factual record. He nevertheless concludes, as do we, that district courts are without power to compel a civil deponent to testify over a valid assertion of his Fifth Amendment right, absent a separate grant of immunity pursuant to § 6002.

[14] Besides the costs of testifying against close associates, any witness increases the risk of committing perjury the more he talks. Cf. 18 U. S. C. § 6002 (perjured testimony not immunized).

ers' need for admissible evidence, our inquiry then is whether this need can be met without jeopardizing the Government's interest in limiting the scope of an immunity grant or encroaching upon the deponent's certainty of protection.

## A

Questions taken verbatim from a transcript of immunized testimony could evoke one of several responses from a deponent: (i) he could repeat or adopt his immunized answer;[15] (ii) he could affirm that the transcript of his immunized answers accurately reflects his prior testimony; (iii) he could recall additional information responsive to the question but not disclosed in his immune testimony; or (iv) he could disclose information that is not responsive to the question. Petitioners do not contend, nor could they, that the prior grant of use immunity affords protection for *all* self-incriminating information disclosed by the immunized witness on *any* occasion after the giving of the immunized testimony. Rather, petitioners argue that only the first three responses would be "derived from" his immune testimony and therefore would be unavailable for use against the deponent in any subsequent criminal prosecution.

Petitioners' premise is that the deposition of Conboy is designed not to discover new information,[16] but to obtain evi-

---

[15] The extreme case would be where petitioners read the entire immunized grand jury transcript; then ask the witness if that is his testimony; and he answers simply "Yes."

[16] Direct examination may not be as limited as petitioners assume. The District Court's civil contempt order stated that the questions asked in the deposition "were taken directly" from the immunized transcripts, but did not define exactly what deposition questions petitioners could ask. Other Courts of Appeals have permitted direct questioning to go beyond mere restatements of the prior testimony. See *In re Corrugated Container Antitrust Litigation, Appeal of Fleischacker*, 644 F. 2d, at 79 (compelling answers to questions "concerning specific subjects that actually were touched upon by questions appearing in the transcript of the immunized testimony"); *Little Rock School District* v. *Borden, Inc.*, 632 F. 2d, at 705 (compelling answers as long as deposition questions confined to " 'the same

dence that simply repeats the statements in the immunized transcript.[17]   Because there will be little opportunity for the grant of immunity to sweep in statements on direct examination that the Government did not intend to immunize, or for the deponent to give responses that may fall outside of the grant of immunity and later be used against him in a subsequent criminal prosecution, petitioners argue that Conboy's deposition will yield only a carbon copy of the grand jury transcript.   In such a situation, it would be desirable for civil plaintiffs, particularly those bringing private suits that supplement the criminal enforcement of the federal antitrust laws, to have access to the available, probative information.

But even if the direct examination is limited to the questions and answers in the immunized transcript, there remains the right of cross-examination,[18] a right traditionally relied upon expansively to test credibility as well as to seek the truth.   Petitioners recognize this problem, but maintain that the antitrust defendants "would be entitled to test the accu-

---

time, geographical and substantive frame work as the [witness' immunized] grand jury testimony'") (quoting *Appeal of Starkey*, 600 F. 2d 1043, 1048 (CA8 1979)).   The dissenting opinion of JUSTICE STEVENS apparently does not attempt to indicate when questioning will exceed proper limits.

[17] For purposes of this case, we assume that the grand jury transcripts are inadmissible as evidence in a civil trial because the testimony is not subject to cross-examination.   Cf. Fed. Rule Evid. 803(8) (hearsay exception for certain public records); Fed. Rule Evid. 804(a)(1) (witness unavailable when exempted from testifying on ground of privilege); Fed. Rule Evid. 804(b)(1) (former testimony admissible when witness unavailable *and* the party against whom the testimony is now offered had an opportunity for cross-examination).

[18] Cf. Fed. Rule Civ. Proc. 26(b)(1) (stating that depositions may be taken "if the information sought appears reasonably calculated to lead to the discovery of admissible evidence"); Fed. Rule Civ. Proc. 30(c) (allowing cross-examination at depositions); Fed. Rule Civ. Proc. 32(a) (deposition "admissible under the rules of evidence applied as though the witness were then present and testifying"); Fed. Rule Evid. 804(b)(1) (deposition admissible if the party against whom the testimony is now offered in a civil action had an opportunity to develop testimony by cross-examination).

racy and truthfulness of Conboy's repeated immunized testimony without going beyond the confines of that testimony." Reply Brief for Petitioners 14–15. Regardless of any limitations that may be imposed on its scope,[19] however, cross-examination is intended to and often will produce information not elicited on direct. We must assume that, to produce admissible evidence, the scope of cross-examination at the deposition cannot easily be limited to the immunized testimony. This assumption implicates both the Government's and the individual's interests embodied in § 6002.

## B

Use immunity was intended to immunize and exclude from a subsequent criminal trial only that information to which the Government expressly has surrendered future use. If the Government is engaged in an ongoing investigation of the particular activity at issue, immunizing new information (e. g., the answers to questions in a case like this one) may make it more difficult to show in a subsequent prosecution that similar information was obtained from wholly independent sources. If a district court were to conclude in a subsequent civil proceeding that the prior immunity order extended to civil deposition testimony closely tracking the immunized testimony, it in effect could invest the deponent with transactional immunity on matters about which he testified at the immunized proceedings. This is precisely the kind of immunity Congress intended to prohibit. The purpose of § 6002 was to limit the scope of immunity to the level that is constitutionally required, as well as to limit the use of

[19] See *United States* v. *Cardillo*, 316 F. 2d 606, 611 (CA2 1963) (in determining whether testimony of a witness who invokes the privilege during cross-examination may be used against defendant, court draws a distinction between cases in which the assertion of the privilege merely precludes inquiry into collateral matters that bear on credibility of witnesses and those in which assertion prevents inquiry into matters about which witness testified on direct).

immunity to those cases in which the Attorney General, or officials designated by him, determine that gaining the witness' testimony outweighs the loss of the opportunity for criminal prosecution of that witness.[20]

## C

Petitioners' interpretation of § 6002 also places substantial risks on the deponent.[21] Unless the grant of immunity assures a witness that his incriminating testimony will not be used against him in a subsequent criminal prosecution, the witness has not received the certain protection of his Fifth Amendment privilege that he has been forced to exchange. No court has authority to immunize a witness. That responsibility, as we have noted, is peculiarly an executive one, and only the Attorney General or a designated officer of the Department of Justice has authority to grant use immunity. See 18 U. S. C. §§ 6002, 6003. Nor should a court, at the time of the civil testimony, predetermine the decision of the court in a subsequent criminal prosecution on the question whether the Government has met its burden of proving that "the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Kastigar*, 406 U. S., at 460. Yet in holding Conboy in contempt for his Fifth Amendment silence, the District Court below essentially predicted that a court in any future criminal prosecution of Conboy will be obligated to protect against evidentiary use of the deposition testimony petitioners seek. We do not think such a predictive judgment is enough.

---

[20] We need not decide whether United States Attorneys, when designated by the Attorney General, presently have authority to immunize the testimony of a witness in a civil proceeding when the Government determines that the public interest would be served.

[21] None of the tests set forth by Courts of Appeals that have adopted petitioners' interpretation of § 6002 provides deponents with certain guidance as to when they *must* talk and when they must *not*. See n. 16, *supra*.

Petitioners' interpretation of § 6002 imposes risks on the deponent whether or not the deposition testimony properly can be used against him in a subsequent criminal prosecution.[22] Accordingly, the District Court's compulsion order in this case, in the absence of statutory authority or a new grant of immunity by the United States Attorney, cannot be justified by the subsequent exclusion of the compelled testimony. As JUSTICE MARSHALL notes in his concurring opinion: "Whatever justification there may be for requiring a witness to give incriminating testimony in aid of a criminal investigation after the Government has granted use immunity, there is no similar justification for compelling a witness to give incriminating testimony for the benefit of a private litigant when the Government has *not* chosen to grant immunity." *Post,* at 267.

The result of compelling testimony—whether it is immunized or excluded—is that the Government's interests, as well as the witness', suffer. Reliance on judicial exclusion of nonimmunized testimony would be inconsistent with the congressional policy of leaving the granting of immunity to the Executive Branch.

As the Court stated in *Maness* v. *Meyers,* 419 U. S. 449 (1975), compelling a witness to testify in "reliance upon a later objection or motion to suppress would 'let the cat out' with no assurance whatever of putting it back." *Id.,* at 463. We believe Conboy acted properly in maintaining his silence in the face of the District Court's compulsion order and by testing the validity of his privilege on appeal.

## IV

This Court has emphasized the importance of the private action as a means of furthering the policy goals of certain fed-

---

[22] Cf. *post,* at 268 (MARSHALL, J., concurring) ("Further incriminating evidence that is derived from compelled testimony cannot always be traced back to its source"); n. 14, *supra* (increasing risk of harm and perjury); n. 23, *infra* (increasing exposure to civil liability).

eral regulatory statutes, including the federal antitrust laws. See, *e. g., Perma Life Mufflers, Inc.* v. *International Parts Corp.*, 392 U. S. 134, 139 (1968); *United States* v. *Borden Co.*, 347 U. S. 514, 518–519 (1954). But private civil actions can only supplement, not supplant, the primary responsibility of government. Petitioners' proposed construction of § 6002 sweeps further than Congress intended and could hinder governmental enforcement of its criminal laws by turning use immunity into a form of transactional immunity for subjects examined in the immunized proceeding. It also puts the deponent in some danger of criminal prosecution unless he receives an assurance of immunity or exclusion that the courts cannot properly give. Silence, on the other hand, preserves the deponent's rights and the Government's interests, as well as the judicial resources that otherwise would be required to make the many difficult judgments that petitioners' interpretation of § 6002 would require.[23]

## V

We hold that a deponent's civil deposition testimony, closely tracking his prior immunized testimony, is not, without duly authorized assurance of immunity at the time, immunized testimony within the meaning of § 6002, and there-

---

[23] The dissent minimizes the enforcement interest that our construction of § 6002 protects, *post*, at 288–290, contending that we "misunderst[ood] the prosecutorial interest," *post*, at 288. We note, however, that by conceding that there is some "risk" that the deponent's testimony may hamper a prosecution, *post*, at 293, the dissent concedes that its interpretation of § 6002 provides at least somewhat broader immunity than Congress intended. Moreover, the dissent overlooks the possible difficulty of securing the cooperation of individuals such as Conboy who may be more reluctant to testify in the immunized proceedings if they know that later deposition testimony may increase their exposure to civil liability. Finally, in the dissent's judgment, "the theoretical risk that compelled testimony could hamper a potential prosecution [is] plainly outweighed by the enforcement interest in allowing the deposition to go forward." *Ibid.* See also *post*, at 289. This, however, is a judgment reserved for officials of the Department of Justice, not the federal courts, to make on a case-by-case basis.

fore may not be compelled over a valid assertion of his Fifth Amendment privilege.[24]    The judgment of the Court of Appeals accordingly is

*Affirmed.*

JUSTICE MARSHALL, concurring.

I join the Court's decision that a witness who has given immunized testimony may invoke the Fifth Amendment privilege at a later proceeding in response to questions based on his immunized testimony.   Permitting a civil litigant to rely on prior immunized testimony to defeat an otherwise valid claim of privilege would be inconsistent with the purposes of the use-immunity statute, regardless of whether, had the witness answered voluntarily, his answers could have been used against him in a later criminal trial.   The Court's decision today does not reach the question whether such answers could later be admitted against the witness.   In his dissenting opinion, JUSTICE STEVENS argues that Conboy may not assert the Fifth Amendment privilege precisely because his answers could not properly be used against him in a later criminal trial.   Because I agree with JUSTICE STEVENS that such answers could *not* be properly used in a subsequent criminal trial, I write separately to explain why I believe respondent nevertheless retained his Fifth Amendment privilege.

If Conboy had voluntarily answered petitioners' deposition questions, his answers would have been "directly or indirectly derived from" his prior testimony before the grand jury.   The questions were based solely on the transcript of respondent's grand jury testimony.   There is no suggestion that the same or similar questions would have been asked had petitioners' attorneys not obtained a transcript of the grand jury testimony.   Thus, if respondent had answered the ques-

---

[24] Our holding is limited to precluding district courts from compelling testimony in a civil deposition over a valid assertion of the Fifth Amendment privilege, absent a specific assurance of immunity for such testimony.

tions, his answers would not have been "derived from a legitimate source wholly independent of the compelled testimony." *Kastigar* v. *United States*, 406 U. S. 441, 460 (1972).

The admission of such answers at a subsequent criminal prosecution would represent a substantial departure from the fundamental premise of this Court's decision in *Kastigar*. In upholding the use-immunity statute against an attack based upon the Fifth Amendment privilege against self-incrimination, the Court concluded that use immunity affords a witness protection "as comprehensive as the protection afforded by the privilege." *Id.*, at 449. The Court stated that the statute "prohibits the prosecutorial authorities from using the compelled testimony in *any* respect," *id.*, at 453 (emphasis in original), and that it "provides a sweeping proscription of any use, direct or indirect, of the compelled testimony and any information derived therefrom," *id.*, at 460. If the prosecution could introduce answers elicited from a witness by questions that would not have been asked but for the witness' immunized testimony, the protection afforded by use immunity would *not* be "as comprehensive as the protection afforded by the privilege." *Id.*, at 449.

I therefore agree with my Brother STEVENS that answers to the questions posed by petitioners' attorneys could not properly have been used at a subsequent criminal trial. It does not follow, however, that respondent can be compelled to answer. In this case it is conceded that, had respondent never given the immunized testimony before the grand jury, he would have been entitled to invoke the Fifth Amendment privilege in response to questions concerning the same subject matter as the questions asked at the deposition. The only question is whether respondent is barred from asserting the Fifth Amendment privilege because he previously testified under a statutory grant of immunity and because his answers to the deposition questions would be "directly or indirectly derived" from his prior immunized testimony.

In my view, a trial judge may not constitutionally compel a witness to give incriminating testimony solely upon a finding that the witness' answers could not properly be used against him in a later criminal proceeding.[1]   This Court's decision in

---

[1] A witness is generally entitled to invoke the Fifth Amendment privilege against self-incrimination whenever there is a realistic possibility that his answer to a question can be used in any way to convict him of a crime. It need not be probable that a criminal prosecution will be brought or that the witness' answer will be introduced in a later prosecution; the witness need only show a realistic possibility that his answer will be used against him.   Moreover, the Fifth Amendment forbids not only the compulsion of testimony that would itself be admissible in a criminal prosecution, but also the compulsion of testimony, whether or not itself admissible, that may aid in the development of other incriminating evidence that can be used at trial.   See *Hoffman* v. *United States*, 341 U. S. 479, 486 (1951).

The privilege is inapplicable only "if the testimony sought cannot possibly be used as a basis for, or in aid of, a criminal prosecution against the witness."   *Brown* v. *Walker*, 161 U. S. 591, 597 (1896).   It has long been recognized that the court may require a witness to give testimony, including testimony that admits to involvement in a criminal act, when there is no possibility of future criminal charges being brought against the witness. For example, a witness may be compelled to testify concerning his involvement in a crime when he is protected from later prosecution by the Double Jeopardy Clause, see, *e. g.*, *Reina* v. *United States*, 364 U. S. 507, 513 (1960) (dictum), by the applicable statute of limitations, see, *e. g.*, *United States* v. *Goodman*, 289 F. 2d 256, 259 (CA4 1961), or by a pardon, see *Brown* v. *Walker*, *supra*, at 599–600.   As JUSTICE BRENNAN indicated in his dissenting opinion in *Piccirillo* v. *New York*, 400 U. S. 548, 564–565 (1971) (dissenting from dismissal of certiorari), this limitation upon the privilege against self-incrimination is derived from the language of the Fifth Amendment:

"Implicitly, of course, 'in any criminal case' suggests a limitation upon the reach of the privilege . . . .   [I]f there is no possibility of a criminal case, then the privilege would not apply.   And that is precisely the basis on which this Court has consistently upheld grants of immunity from *Brown* v. *Walker*, 161 U. S. 591 (1896), to *Ullman* v. *United States*, 350 U. S. 422 (1956)."

It has also been recognized that a court may compel a witness to testify when his answers could neither implicate him in any criminal conduct nor possibly lead to the discovery of past criminal conduct.   See *Hoffman* v.

*Kastigar* v. *United States, supra,* does not support such compulsion. In *Kastigar* the Court was concerned with a federal statute that permits a United States Attorney, a federal agency, or a duly authorized representative of Congress to grant use immunity and thereby compel a witness to give incriminating testimony. See 18 U. S. C. §§ 6002–6005. *Kastigar* itself involved a grant of use immunity conferred upon a witness called to testify before a grand jury. In upholding the use-immunity statute against constitutional attack, the Court held only that, pursuant to statutory authority to confer such immunity, the *Government* may constitutionally compel incriminating testimony in exchange for immunity from use or derivative use of that testimony. 406 U. S., at 462. *Kastigar* does not hold that a trial judge, acting without statutory authority to grant immunity, may rely on prior immunized testimony to overrule an otherwise valid assertion of the Fifth Amendment privilege by a deponent in a civil case.

Whatever justification there may be for requiring a witness to give incriminating testimony in aid of a criminal investigation after the Government has granted use immunity, there is no similar justification for compelling a witness to give incriminating testimony for the benefit of a private litigant when the Government has *not* chosen to grant immunity. Any interest served by compelling the testimony

---

*United States, supra; Heike* v. *United States,* 227 U. S. 131, 142–145 (1913). This limitation, too, is implicit in the language of the constitutional guarantee, since a witness who has been forced to provide testimony that cannot incriminate him has not in any meaningful sense been "compelled in any criminal case to be a witness against himself."

In this case, the Fifth Amendment privilege is fully applicable. Respondent remains subject to criminal prosecution, and his answers to the deposition questions asked by petitioners' attorneys would both implicate him in criminal conduct and tend to lead to further incriminating information.

is insufficient to justify subjecting the witness to the risks that attend the compulsion of incriminating testimony.

Whenever a witness is forced to give incriminating testimony, there is a significant risk that fruits of that testimony will later be used against him. Further incriminating evidence that is derived from compelled testimony cannot always be traced back to its source:

> "A witness who suspects that his compelled testimony was used to develop a lead will be hard pressed indeed to ferret out the evidence necessary to prove it. And of course it is no answer to say he need not prove it, for though the Court puts the burden of proof on the government, the government will have no difficulty in meeting its burden by mere assertion if the witness produces no contrary evidence. The good faith of the prosecuting authorities is thus the sole safeguard of the witness' rights. [E]ven their good faith is not a sufficient safeguard. For the paths of information through the investigative bureaucracy may well be long and winding, and even a prosecutor acting in the best faith cannot be certain that somewhere in the depths of his investigative apparatus, often including hundreds of employees, there was not some prohibited use of the compelled testimony." *Kastigar* v. *United States*, 406 U. S., at 469 (MARSHALL, J., dissenting).

See also *Piccirillo* v. *New York*, 400 U. S. 548, 567–568 (1971) (BRENNAN, J., dissenting from dismissal of certiorari); *Speiser* v. *Randall*, 357 U. S. 513, 525 (1958). If respondent is not allowed to assert the Fifth Amendment privilege, he may undergo numerous civil depositions, he may be forced to elaborate upon his original testimony,[2] and his testimony

---

[2] The questioning at the deposition went well beyond mere ratification of the accuracy of the grand jury transcript. Conboy was also called upon to answer again the identical questions asked before the grand jury. While it may be true that petitioners expected Conboy "only to ratify or

may be broadly disseminated. As a result, he may face a much greater risk that tainted evidence will be used against him than he initially faced following the compulsion of the grand jury testimony. The opportunity to seek exclusion of tainted evidence is an incomplete protection, for "a court, at the time of the civil testimony, [cannot] predetermine the decision of the court in a subsequent criminal prosecution on the question whether the Government has met its burden of proving that 'the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.'" *Ante,* at 261 (quoting *Kastigar* v. *United States, supra,* at 460). Cf. *Maness* v. *Meyers,* 419 U. S. 449, 461–463 (1975).

It may be appropriate to subject a witness to these risks when the Government has conferred use immunity pursuant to statutory authorization, but the interests supporting compulsion of the testimony are far weaker here. In *Kastigar* the Court noted that the use-immunity statute advanced the Government interests in compelling incriminating testimony, 406 U. S., at 443–444, 446–447, and in leaving open the possibility of prosecuting the witness on the basis of "evidence from legitimate independent sources," *id.,* at 461. In this case, however, neither Congress nor the United States Attorney has made a similar expression of Government interest.[3] The only public interest that would be served by forcing respondent to testify would be that of obtaining testi-

---

confirm facts that were already known," *post,* at 295 (STEVENS, J., dissenting), there was no assurance in this case that Conboy's answers, based upon his current recollection of events, would not provide details that were absent from his prior grand jury testimony.

[3] As the Court observes, the Government interests that supported the compulsion of incriminating testimony in *Kastigar* would be undermined by the compulsion of respondent's testimony in this case. The Government interest in preserving the chance to prosecute respondent in the future based on "legitimate independent" evidence would be compromised by the creation of additional immunized testimony. *Ante,* at 260–261.

mony relevant to a private antitrust suit.[4] Even that interest would not be substantially served.[5]

If he were compelled to answer petitioners' deposition questions, Conboy would face a realistic risk that his testimony would lead to further incriminating evidence that he would be unable to exclude at a subsequent criminal prosecution. The interests underlying the use-immunity statute have no application here, and in my view the general interest in obtaining testimony cannot be considered an adequate substitute for those interests. I therefore join the Court in concluding that the Fifth Amendment does not permit a trial judge in a civil case to compel incriminating testimony solely upon a finding that the testimony would be "directly or

---

[4] Even if the United States Attorney consented to the trial judge's compulsion of respondent's answers, the judge's action might be improper. As the Court notes, it is an open question whether the Government has statutory authority "to immunize the testimony of a witness in a *civil* proceeding when the Government determines that the public interest would be served." *Ante*, at 261, n. 20 (emphasis added). Moreover, the constitutionality of such a statutory authorization remains open to doubt. Cf. *Garrity* v. *New Jersey*, 385 U. S. 493, 496 (1967) (declining to consider constitutionality of forfeiture-of-office statute which, in effect, allowed the authorities to compel a public officer, under threat of removal from office, to provide incriminating testimony in exchange for immunity from use or derivative use of that testimony at a criminal proceeding).

Indeed, this Court has not yet spoken as to the circumstances under which a trial court in a *criminal* case may compel a defense witness to testify concerning questions as to which he had previously testified before the grand jury or may compel the Government to secure such a witness' testimony by granting him immunity. Cf. *United States* v. *Praetorius*, 622 F. 2d 1054, 1064 (CA2 1980); *United States* v. *Morrison*, 535 F. 2d 223, 229 (CA3 1976); *United States* v. *Alessio*, 528 F. 2d 1079 (CA9 1976); *Earl* v. *United States*, 124 U. S. App. D. C. 77, 80, n. 1, 361 F. 2d 531, 534, n. 1 (1966) (Burger, J.).

[5] It is questionable whether the deposition testimony would be admissible at trial, in light of the limits that might have to be placed on cross-examination by the other civil litigants. *Ante*, at 259–260. Nor would respondent's answers help petitioners obtain further relevant information, since petitioners already have access to respondent's grand jury testimony.

indirectly derived from" the witness' previously immunized testimony.

JUSTICE BRENNAN, concurring in the judgment.

The Court today holds that

> "a deponent's civil deposition testimony, closely tracking his prior immunized testimony, is not, without duly authorized assurance of immunity at the time, immunized testimony within the meaning of § 6002, and therefore may not be compelled over a valid assertion of his Fifth Amendment privilege." *Ante,* at 263–264 (footnote omitted).

JUSTICE BLACKMUN's opinion concurring in the judgment likewise states:

> "In this case, we are asked to decide whether a witness who has testified before a federal grand jury pursuant to a grant of use immunity, 18 U. S. C. §§ 6001–6005, may be forced to testify about the same events in a subsequent civil deposition, despite his assertion of his Fifth Amendment privilege against self-incrimination. I agree with the Court's conclusion that he may not be forced so to testify." *Post,* at 272.

I understand these to be two statements of the same rule,* and I completely agree with both of them. For this reason, I concur in the judgment of the Court.

---

*While the majority's statement of the holding is formally limited to the situation where a deponent's deposition testimony "closely track[s] his prior immunized testimony," *ante,* at 263, I do not take that to be a substantive difference between its formulation and that of JUSTICE BLACKMUN. As both the majority's opinion and JUSTICE STEVENS' dissenting opinion, *post,* p. 282, make clear, the "closely tracking" situation is the strongest possible case for finding that the deposition testimony is derived from the prior immunized testimony. Hence, to hold that a deponent may assert his privilege in this case is necessarily to hold that he may do so in all cases, as JUSTICE BLACKMUN states explicitly.

I am not in entire agreement with everything in the majority opinion or in JUSTICE BLACKMUN's opinion. My differences with them, however, are over small matters of approach, and do not go to the substance of their conclusions. Moreover, this case arises in the rather specialized legal setting of use immunity statutes and does not require any broad-ranging analysis beyond the scope of the problem here presented. With these considerations in mind, I do not think it worthwhile to file a lengthy separate opinion setting forth these differences in detail.

JUSTICE BLACKMUN, concurring in the judgment.

In this case, we are asked to decide whether a witness who has testified before a federal grand jury pursuant to a grant of use immunity, 18 U. S. C. §§ 6001–6005, may be forced to testify about the same events in a subsequent civil deposition, despite his assertion of his Fifth Amendment privilege against self-incrimination. I agree with the Court's conclusion that he may not be forced so to testify. Because I reach this conclusion only by a different route, I write separately to explain my views.

I

The statute authorizing grants of use immunity, 18 U. S. C. § 6002, provides that a witness may be ordered to testify despite his claim of a Fifth Amendment privilege, but "no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case" (with stated limited exceptions). The Court notes that the parties in this case "make their arguments in terms tracking those of the statute—whether the deposition testimony is 'derived from' the prior testimony." *Ante,* at 256. In the Court's view, however, "the crux of their dispute is whether the earlier grant of immunity itself compelled Conboy to talk." *Ibid.* It seems to me that by characterizing the issue in this way, the Court

begs the question now before us.   The earlier grant of immunity, by itself, obviously does not compel Conboy to testify at a later deposition.   It is the District Court that has sought to compel Conboy's testimony.   Whether that court may do so is certainly the ultimate issue the Court must decide.   But the Court's rephrasing does not bring us closer to the answer.

It is, of course, black-letter law that a witness cannot assert a Fifth Amendment privilege not to testify "if the testimony sought cannot possibly be used as a basis for, or in aid of, a criminal prosecution against the witness." *Brown* v. *Walker*, 161 U. S. 591, 597 (1896); see *Mason* v. *United States*, 244 U. S. 362, 365–366 (1917).   In this case, however, the Court concludes that Conboy has a valid Fifth Amendment privilege "irrespective of whether . . . his [deposition] answers could have been admitted against him at a criminal trial." *Ante*, at 257, n. 13.   The Court never explains the basis for this conclusion, and it seems to me that it is plainly wrong.   If Conboy's deposition testimony cannot be used against him in a subsequent criminal prosecution, he cannot assert a Fifth Amendment privilege at his deposition and the District Court may compel him to testify.   We must turn to § 6002 to determine whether the testimony can be so used.   Section 6002 informs us that when immunity has been granted, the witness is protected against use of "information directly or indirectly derived from [the immunized] testimony."   Whether Conboy's deposition testimony is so derived is the real issue before the Court.

The Court finds this statutory language irrelevant to its analysis.   The Court asserts that petitioners have a "need for admissible evidence," the Government has an "interest in limiting the scope of an immunity grant," and respondent Conboy has an "interest . . . that [his Fifth Amendment] protection be certain." *Ante*, at 258, 257.   The Court then seeks to adjust these interests and arrive at a solution satisfactory to all.   While this may be appropriate as a means of

setting public policy,[1] I cannot agree that it is an appropriate method of statutory interpretation.

As with every case involving the construction of a statute, "our starting point must be the language employed by Congress." *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 337 (1979). If we were forced to examine the language of § 6002 without reference to its background and legislative history, the words of the statute might be sufficiently ambiguous so as to require resort to the policy concerns addressed by the Court. In this case, however, "regard for the specific history of the legislative process that culminated in the Act now before us affords more solid ground for giving it appropriate meaning." *United States* v. *Universal C. I. T. Credit Corp.*, 344 U. S. 218, 222 (1952).

## II

## A

This Nation's first use immunity statute was passed by Congress in 1868. It provided that "no answer or other pleading of any party, and no discovery, or evidence obtained by means of any judicial proceeding from any party or witness . . . , shall be given in evidence, or in any manner used against such party or witness . . . , in any court of the United States . . . , in respect to any crime." Act of Feb. 25, 1868, ch. 13, § 1, 15 Stat. 37. In *Counselman* v. *Hitchcock*, 142 U. S. 547 (1892), this Court held that immunity of this type could not be used to compel a witness to testify against himself, because it did not provide protection coextensive with the Fifth Amendment. The *Counselman* Court reasoned that the statute

---

[1] As JUSTICE STEVENS' dissent demonstrates, the interests of the Government and the parties are not at all as clear as the Court asserts. Reliance on these interests is particularly inappropriate in a case such as this one, where the Government is not a party and we can only speculate about which interpretation of the statute would best serve the Government's interest in law enforcement.

"protected [the witness] against the use of his testimony against him . . . in any criminal proceeding, in a court of the United States. But it had only that effect. It could not, and would not, prevent the use of his testimony to search out other testimony to be used in evidence against him . . . . It could not prevent the obtaining and the use of witnesses and evidence which should be attributable directly to the testimony he might give under compulsion, and on which he might be convicted, when otherwise, and if he had refused to answer, he could not possibly have been convicted." *Id.*, at 564.

In concluding, the Court stated that "no statute which leaves the party or witness subject to prosecution after he answers the criminating question put to him, can have the effect of supplanting the privilege conferred by the Constitution of the United States." *Id.*, at 585.

Due to this latter statement in the *Counselman* opinion, Congress and the lower courts assumed that only a broad "transaction" immunity would satisfy the requirements of the Fifth Amendment. Thus, beginning in 1893, Congress enacted a series of statutes giving a witness complete immunity from prosecution for any crime divulged in compelled testimony. This reliance on transaction immunity continued until 1970, when Congress enacted § 6002 as part of the Organized Crime Control Act of 1970, Pub. L. 91–452, 84 Stat. 927.

In the meantime, however, the Court decided several cases suggesting that some forms of use immunity would be constitutionally permissible. In *Murphy* v. *Waterfront Comm'n*, 378 U. S. 52 (1964), the Court held that a state witness could not be compelled to give testimony that could be incriminating under federal law "unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him." *Id.*, at 79. In a footnote, the Court added that once a defendant had been immunized in a state proceeding, "the federal authori-

ties have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence." *Id.*, at 79, n. 18. Several years later, in *Gardner* v. *Broderick*, 392 U. S. 273, 276 (1968), the Court stated that "[a]nswers may be compelled regardless of the [Fifth Amendment] privilege if there is immunity from federal and state use of the compelled testimony or its fruits in connection with a criminal prosecution against the person testifying." And shortly thereafter, in *People* v. *La Bello*, 24 N. Y. 2d 598, 602, 249 N. E. 2d 412, 414 (1969), the New York Court of Appeals interpreted *Murphy* and *Gardner* to hold that *Counselman* did not bar use immunity statutes, so long as they protected the immunized witness "from the use of his testimony or the fruits thereof."

### B

It was in this context that Congress in 1969 began considering a new type of immunity statute. The House and Senate Reports accompanying the Organized Crime Control Act of 1970 make clear that Congress was persuaded by the reasoning of these cases. After quoting from *La Bello* and discussing *Counselman* and *Murphy* at length, see S. Rep. No. 91–617, pp. 52–55 (1969); H. R. Rep. No. 91–1188, pp. 8–11 (1970), the Reports state that the statutory immunity provided by § 6002 "is intended to be as broad as, but no broader than, the privilege against self-incrimination. . . . It is designed to reflect the use-restriction immunity concept of *Murphy* . . . rather [than] the transaction immunity concept of *Counselman*." S. Rep. No. 91–617, at 145; H. R. Rep. No. 91–1188, at 12; see H. R. Rep. No. 91–1549, p. 42 (1970).

Section 6002's prohibition against the use of compelled testimony or "any information directly or indirectly derived from such testimony" reflected Congress' view of the extent of the Fifth Amendment privilege. According to the House and Senate Reports, the phrase was chosen to conform to "present law" on "the use of evidence derivatively obtained."

The Reports then cite *Wong Sun* v. *United States*, 371 U. S. 471 (1963), the seminal case on what is commonly known as the "fruits" doctrine, as representing "present law." See S. Rep. No. 91–617, at 145; H. R. Rep. No. 91–1188, at 12; H. R. Rep. No. 91–1549, at 42. In *Murphy* and *Gardner*, upon which Congress relied, the Court had used the term "fruits" to describe the constitutional limits on use immunity. References to the "fruits" doctrine are scattered throughout the legislative history, whenever the boundaries of the use immunity statute are discussed.[2] In *Kastigar* v. *United States*, 406 U. S. 441, 461 (1972), we recognized that the immunity § 6002 provides is "analogous to the Fifth Amendment requirement in cases of coerced confessions." We noted that § 6002 was modeled on a recommendation from the National Commission on Reform of Federal Criminal Laws, and we quoted with approval a Commission report stating: "'The proposed immunity is . . . of the same scope as that frequently, even though unintentionally, conferred as the result of constitutional violations by law enforcement officers.'" *Id.*, at 452, n. 36 (quoting Second Interim Report of the National Commission on Reform of Federal Criminal Laws, Mar. 17, 1969, Working Papers of the Commission 1446 (1970)).

In light of this evidence of legislative intent, the phrase "directly or indirectly derived from" in § 6002 cannot be re-

---

[2] See, *e. g.*, S. Rep. No. 91–617, p. 108 (1969) (§ 6002 "is a restriction against use of incriminating disclosures or their fruits"); Hearings on S. 30 et al. before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 91st Cong., 1st Sess., 216 (1969) (report of New York County Lawyers' Association) (under § 6002, the "testimony so compelled or its fruits may not be used against the witness"); *id.*, at 281 (statement of Rep. Poff) (rule of § 6002 is "similar to the exclusionary rule which is now applied to evidence assembled in violation of various constitutional rights"); *id.*, at 506 (statement of Sen. McClellan) (use immunity statutes can be made constitutional "through the use of the fruit of the poisonous tree process of derivative suppression, an analogy borrowed from fourth amendment illegally obtained evidence cases").

garded as ambiguous or lacking in meaning. It seems to me that Congress made its intent clear. First, it intended to grant only the minimum protection required by the Constitution. Second, it believed that the protection constitutionally required in cases of compelled testimony was identical to the protection required in cases of coerced statements or evidence otherwise illegally obtained.

Respondent Conboy's interpretation of § 6002 is obviously narrower than that offered by petitioners; deposition testimony involving the same subject matter as prior immunized testimony would be protected by the prior grant of use immunity under petitioners' interpretation, but not under Conboy's. Because Congress intended grants of use immunity to be as narrow as possible, we must accept Conboy's interpretation if it is consistent with the Constitution. The question before us, then, is whether a witness' Fifth Amendment rights would be violated if testimony given at a subsequent deposition were not covered by his grant of use immunity.

When an incriminating statement has been obtained through coercion, the Fifth Amendment prohibits use of the statement or its "fruits." Congress understood this when it enacted § 6002, and, as the legislative history demonstrates, Congress intended to incorporate the "fruits" doctrine into the statute by use of the phrase "directly or indirectly derived." In order to ascertain whether respondent Conboy's deposition testimony would be "directly or indirectly derived" from his immunized grand jury testimony, and consequently whether Conboy's interpretation of the statute is constitutional, we must determine whether the deposition testimony would be "fruits" as that concept is understood in the context of the Fourth and Fifth Amendments.[3]

---

[3] The considerations underlying the Fifth Amendment "fruits" doctrine are not necessarily the same as those relevant in the Fourth Amendment context. With respect to the issue before us, however, Fourth Amendment "fruits" cases provide us with guidance in determining whether a wit-

## III

In *Wong Sun* v. *United States, supra,* the Court held that a statement following an illegal arrest must be suppressed as "fruits" of the arrest unless it results from "an intervening independent act of a free will," and is "sufficiently an act of free will to purge the primary taint of the unlawful invasion." 371 U. S., at 486. In *Harrison* v. *United States,* 392 U. S. 219, 222–224 (1968), the Court applied a similar standard to statements following an illegally obtained confession. Our more recent cases have adhered to this test. See, *e. g., Rawlings* v. *Kentucky,* 448 U. S. 98, 107–110 (1980); *Brown* v. *Illinois,* 422 U. S. 590, 600–604 (1975). In determining whether this standard is met, we examine a range of factors including the speaker's knowledge of his Fifth Amendment rights; the temporal proximity of the constitutional violation and the subsequent statement; the nature of the violation and of the Government's involvement; and, of course, the voluntariness of the statement. See *id.,* at 603–604. In brief, the issue is whether the speaker has voluntarily chosen to make the later statement, uninfluenced by the fact that prior statements have been compelled.[4]

I find little difficulty in concluding that if a witness in Conboy's position were to testify during his civil deposition, his statements would not be "fruits" of his previous immunized testimony.[5] In this case, Conboy attended his deposi-

---

ness' deposition testimony is "derived from" prior immunized testimony within the meaning of § 6002.

[4] In *Kastigar* v. *United States,* 406 U. S. 441, 459 (1972), we recognized that Congress intended § 6002 to provide the minimum protection required by the Constitution. *Wong Sun* and its progeny establish that the "fruits" doctrine provides all the protection the Constitution requires. Thus, although my analysis is framed in terms of constitutional standards, the issue here of what the Constitution requires is not different from the issue of what Congress intended.

[5] My analysis is necessarily limited to the choices facing a witness prior to the threat of contempt by the district court. The witness cannot be held in contempt unless the testimony sought is protected by the grant of

tion accompanied by a lawyer. He was obviously aware of his Fifth Amendment rights, and he asserted them with vigor. There is no suggestion that Conboy was under a misapprehension about the relationship between his immunized testimony and his civil deposition. The deposition took place long after the conclusion of the immunized testimony, and Conboy did not remain under the impression that his testimony was being compelled by the Justice Department. From his past experience before the grand jury, Conboy knew that each time the Justice Department required his testimony, it provided a fresh grant of use immunity. Government attorneys were not involved in this civil case, and no fresh grant of immunity had been obtained. Under the circumstances, there was no danger that Conboy would inadvertently incriminate himself under some lingering compulsion of the prosecuting authorities. Any statement he made would have been an independent act of free will. Consequently, had Conboy answered the deposition questions, his testimony would not have been protected by the original immunity grant because it would not have been directly or indirectly derived from his immunized testimony.

In my view, a prior grant of use immunity could never justify compelling a witness' testimony over a claim of Fifth Amendment privilege at a subsequent civil deposition. Although not every witness will be as well informed as Conboy, any witness who asserts the privilege necessarily engages in an independent act of free will. The assertion of the privilege should signal the judge supervising the civil proceedings that the testimony may well not be "derived from" the immunity grant.[6] Although the compelled testimony would be in-

use immunity or, in other words, unless it would be "fruits." The question *whether* the testimony would be "fruits" thus cannot turn on whether the district court has issued a contempt order.

[6] I agree with JUSTICE STEVENS that the existence of a witness' Fifth Amendment privilege does not depend on his decision to assert the privilege. See *post*, at 287, n. 7. Nevertheless, the state of mind of the

admissible at a subsequent criminal trial,[7] I agree with the Court that a witness should not be forced to rely upon the uncertainties of a later motion to suppress. This would indeed "'"let the cat out" with no assurance whatever of putting it back.'" *Ante*, at 262 (quoting *Maness* v. *Meyers*, 419 U. S. 449, 463 (1975)).

I do not mean to suggest, however, that whenever a witness immunized in prior proceedings testifies at a civil deposition *without* asserting a Fifth Amendment privilege, his testimony automatically should be admissible against him in a subsequent criminal prosecution. If there is a subsequent prosecution and the Government seeks to introduce deposition testimony of this sort, the judge in the criminal case should determine whether, under the circumstances, the deposition testimony is inadmissible as "derived from" the prior immunized statements. If the witness reasonably believed that his prior grant of immunity protected his testimony, the testimony might well be derived from the immunity grant under the standards I have set forth above. If, on the other hand, the deposition testimony was a truly independent act of free will, it would be admissible in any later prosecution.

---

witness is relevant to a "fruits" inquiry, because a witness' statements are "fruits" only if they do not result from an independent act of free will. Cf. *Harrison* v. *United States*, 392 U. S. 219, 222–224 (1968). A witness' assertion of the privilege is strong evidence of that state of mind; the witness has demonstrated that he feels free to decide whether or not to speak.

[7] It seems to me beyond question that deposition testimony compelled by means of a contempt order, over the assertion of a Fifth Amendment privilege, would be inadmissible at a subsequent criminal trial whether or not it was later held to be within the scope of the original grant of immunity. If the testimony was within the grant of immunity (*i. e.*, if it was "fruits"), it would be inadmissible under § 6002. If the testimony was not within the grant of immunity, the witness should have been permitted to assert his privilege and the testimony wrongfully compelled should be excluded. See *Maness* v. *Meyers*, 419 U. S. 449, 474 (1975) (WHITE, J., concurring in result).

JUSTICE STEVENS, with whom JUSTICE O'CONNOR joins, dissenting.

A witness in a judicial proceeding has a duty to answer proper questions. The witness cannot, however, be compelled to incriminate himself. If a witness believes a truthful response to a question could be used against him in a subsequent criminal proceeding, or might lead to the discovery of incriminating evidence, he may assert his constitutional right to remain silent. When such an assertion is made, a judge must evaluate the asserted risk. If it clearly appears that the answer could not be used against the witness in a subsequent criminal proceeding and could not provide a prosecutor with any information that he does not already have, the witness must speak. This case concerns a witness' refusal to give answers that could not incriminate him.

The Court today holds that the existence of a valid Fifth Amendment privilege does not depend on whether a truthful answer would be incriminating. The Court does not dispute the fact that neither the respondent's answers during the deposition in this case, nor any information discovered on the basis of those answers, could be used against him in a subsequent criminal proceeding. *Ante*, at 257, n. 13. Nevertheless, the Court holds that the Fifth Amendment empowers the respondent to refuse to testify. The opinion of the Court stresses two interests: "the Government's need for admissible evidence" in a future effort to prosecute the respondent, and "the individual's interest in avoiding self-incrimination." *Ante*, at 256. It holds that potential threats to those interests create a Fifth Amendment privilege in this case.

I am frankly puzzled by this analysis. The Government's supposed desire to introduce evidence in a future proceeding should be irrelevant if the Government has *already* forsworn the right to introduce that evidence by a prior grant of immunity. And, as far as the deponent's interest in avoiding self-incrimination is concerned, "he should be indifferent between the protection afforded by silence and that afforded by immu-

nity," *ante*, at 257. Thus, whether analyzed from the point of view of the prosecutor or the witness, the same question must be answered: whether the statutory immunity that has already attached to respondent's grand jury testimony precludes the Government, or any other prosecutor, from using the respondent's deposition answers against him in any criminal case. That question requires an analysis not of whether the deposition answers are "immunized 'testimony,'" *ante*, at 250, but rather of whether the answers would be "directly or indirectly derived from [his grand jury] testimony" within the meaning of the use-immunity statute. Because I think it clear that they would be so derived, I respectfully dissent.

## I

Respondent has been a witness in two separate proceedings. In January 1978, he was subpoenaed to testify before a federal grand jury investigating a violation of the Sherman Act. Because he was a participant in the price-fixing arrangements under review, he asserted his constitutional privilege against being compelled to be a witness against himself.[1] The prosecutor then invoked his authority under the Organized Crime Control Act of 1970,[2] and a federal judge ordered the respondent to testify in exchange for a grant of immunity.

In May 1981, respondent was subpoenaed to appear in a second proceeding.[3] At that deposition proceeding, respond-

---

[1] The Fifth Amendment provides:

"No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."

[2] See 18 U. S. C. §§ 6002, 6003, quoted by the Court, *ante*, at 253–254, nn. 9 and 10.

[3] This second proceeding happens to have been a pretrial deposition in a civil case, but the issue before us would be no different if the second proceeding had been a criminal trial of respondent's co-conspirators, or a coroner's inquest. Respondent happens to have been represented by able counsel at the second proceeding, but again the scope of his immunity would be no different if he had not had a lawyer and had simply answered the questions that were propounded. Moreover, the fact that respondent

ent was asked the same questions that he had been asked before the grand jury. Everyone agrees that the questions were derived from the transcript of his grand jury testimony, and no one disputes the fact that truthful answers to those questions would merely have confirmed information that was already recorded in the grand jury transcript.[4] It is therefore logical to inquire, as the court below did, whether ratification of the prior immunized testimony would subject the respondent to a new risk of prosecution.

The plain language of the Organized Crime Control Act protects the witness from that risk. The law provides:

> "[N]o testimony or other information compelled under the order *(or any information directly or indirectly derived from such testimony or other information)* may be used against the witness in any criminal case . . . ." 18 U. S. C. § 6002 (emphasis added).

When a witness appears at a second proceeding and is asked whether the information that he was previously compelled to disclose to the grand jury was true, his responses are quite plainly "information directly or indirectly derived from such testimony." This seems particularly obvious when the in-

---

asserted his privilege against self-incrimination has nothing to do with the availability of the privilege—a matter which is dependent entirely on whether the content of a truthful answer to the questions that were propounded could be used against him in a later criminal trial. His reluctance or willingness to testify would determine whether he elected to assert his privilege or to waive it, but has nothing to do with the existence or nonexistence of the privilege itself.

[4] One insignificant nonincriminating fact would be added. The grand jury transcript establishes (1) that respondent had price communications with Fred Renshaw and Dick Herman and (2) that he remembered those communications at the time of his grand jury testimony; an answer to the deposition question would establish the additional fact that respondent still remembers those communications. That additional fact is not itself incriminating and certainly is information indirectly derived from the grand jury transcript within the meaning of the statute.

terrogator's only basis for his questions is the transcript of the grand jury proceeding.

This natural construction of the statute was endorsed by the Government immediately after the Organized Crime Control Act took effect. In a memorandum explaining the statute to United States Attorneys, the Assistant Attorney General in charge of the Criminal Division explained that it allowed an immunized witness to be prosecuted "if it can be clearly established that independent evidence standing alone is in fact the sole basis of the contemplated prosecution." Dept. of Justice Memo No. 595, Supp. 1, Sept. 2, 1971, p. 5. He emphasized that, "[a]lthough the government may prosecute the witness on the basis of similar evidence obtained independently of the witness's testimony in a rare case where such an independent source develops, as a practical matter it will be difficult for the government to prove an independent derivation, especially if the information *first* was divulged in the witness's testimony." *Id.*, at 5, n. 4 (emphasis in original). And when the Solicitor General of the United States later appeared before this Court to defend the Act's constitutionality, he based his argument in part on the proposition that the words "directly or indirectly derived" were intended to create an "extended use immunity" and should be construed broadly.[5]

---

[5] In relevant part, the argument reads:

"[MR. GRISWOLD:] . . . As to evidence first discovered after immunity has been granted, there should be a heavy burden on the government to show that any such evidence is not the fruit of a lead or clue resulting from or uncovered by the compelled testimony. This should not be a conclusive presumption because there can be cases where the government can demonstrate that such evidence was independently derived. It comes in the mail, for example, the day after the testimony was given and it had been postmarked in France a week before.

.  .  .  .  .

"Q. Well, Mr. Solicitor General, what about the situation . . . where the government does compel a testimony and the testimony is given and this induces the prosecutor not to use the testimony except to launch an investi-

This Court accepted the Solicitor General's argument. It upheld the use immunity statute after construing it to provide protection commensurate with the protection resulting from the invocation of the privilege itself:[6]

> "The statute provides a sweeping prohibition of any use, direct or indirect, of the compelled testimony and any information derived therefrom . . . .
>
> .     .     .     .     .
>
> "[The] burden of proof, which we reaffirm as appropriate, is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from *a legitimate source wholly independent of the compelled testimony." Kastigar* v. *United States,* 406 U. S. 441, 460 (emphasis added).

---

gation and by independent means, wholly unrelated to the testimony except by the fact that it was given, search out, independently—

"MR. GRISWOLD: That is a hard question, but I think if it does appear that the investigation was the consequence of the evidence being given, that then the evidence is something which was indirectly derived as a result of the testimony given.

"Q. Would you—

"MR. GRISWOLD: I would construe directly and indirectly quite broadly and I would put the burden on the government with respect to evidence derived after the testimony is given.

"Q. So 'but for,' you put on a 'but for' test in the sense that except for the testimony the government would never have had it?

"MR. GRISWOLD: Almost, Mr. Justice. On the other hand, I hate very much to give conclusions about purely hypothetical cases, knowing full well the practical situations that can arise which will make it look differently, but I'm perfectly free to say that I think there should be a heavy burden on the government to show that the evidence it wants to use was not directly or indirectly derived from the testimony." Tr. of Oral Arg. in *Kastigar* v. *United States,* O. T. 1971, No. 70–117, pp. 30–32. See also the Solicitor General's brief in *Kastigar,* quoted in nn. 8, 9, 12, *infra.*

[6] If the grant were not at least that broad, a witness obviously could not be compelled to testify before a grand jury. See *Counselman* v. *Hitchcock,* 142 U. S. 547; *Ullmann* v. *United States,* 350 U. S. 422, 436–438.

We held that evidence may be used in a subsequent prosecution only if the Government successfully demonstrates that it would have obtained that evidence even if the witness had never testified before the grand jury. See *id.*, at 458–459; *Murphy* v. *Waterfront Comm'n*, 378 U. S. 52, 79.

The questions that were propounded to the respondent at his deposition in this case called for answers that were presumptively within the scope of the statutory immunity. That presumption would protect him from the use in a subsequent criminal prosecution of any of the information contained in his answers unless it could be shown that the information would have been obtained even if the witness had never testified before the grand jury. Nothing in this record suggests that answers to questions based entirely on the grand jury transcript were not "fruits" of the prior testimony.[7]

The District Judge properly ruled that the respondent's answers could not have been introduced against him at a subsequent criminal prosecution any more than the original testimony could have been. Moreover, if the respondent's answers would be a necessary link in a chain that led to other information, then that information would also be "derived" from the prior testimony and likewise could not be used at a subsequent criminal prosecution. The witness therefore had no greater right to assert a constitutional privilege against

---

[7] Cf. *Harrison* v. *United States*, 392 U. S. 219. In his opinion concurring in the judgment JUSTICE BLACKMUN seems to assume that the "fruits" inquiry focuses on the state of mind of the deposition witness rather than on the historical derivation of the evidence. He suggests that if the witness "elects" to answer a question, his response is not a fruit and therefore is not directly or indirectly derived from the prior testimony. Even under that approach, however, I would think the question is whether the witness has any choice in the matter. He is being asked about incriminating testimony that, by hypothesis, he would prefer not to repeat. Nevertheless, since he is under subpoena, he must speak unless he has a valid Fifth Amendment privilege, and neither the Constitution nor the statute vests *him* with any power to decide whether he does.

self-incrimination in the second proceeding than he had in the grand jury proceeding itself.

## II

Although the Court does not dispute the fact that respondent's answers were within the scope of the immunity grant, *ante*, at 257, n. 13, it nevertheless places a great deal of reliance on "the Government's interest in limiting the scope of an immunity grant," *ante*, at 258. In my judgment the Court commits a triple error in this analysis. First, it uses policy judgments that could at most affect an interpretation of the use immunity statute in other cases to justify its erroneous interpretation of the Fifth Amendment in this case. Second, it misunderstands the prosecutorial interest in how the statute should be interpreted in those other cases. And third, it overlooks the obvious enforcement costs of its holding in *this* case. The first error does not need elaboration; the second two do.

A federal prosecutor does not offer immunity to a suspected criminal unless he expects to obtain important testimony that would not otherwise be available. The prosecutor realizes that, in almost all cases, an offer of immunity—even of use immunity—means sacrificing the chance to prosecute the witness for his own role in the criminal enterprise.[8] The

---

[8] As the Solicitor General assured us in *Kastigar:* "The immunity provision involved in this case was not passed for the purpose of enabling law enforcement officials to compel self-incriminating information from witnesses and then prosecute them for routine matters." Brief for United States in *Kastigar* v. *United States*, O. T. 1971, No. 70–117, pp. 32–33.

This fact was emphasized to the Congress that passed the use immunity provision. The Assistant Attorney General in charge of the Criminal Division of the Department of Justice testified that, "[a]s a practical matter, where the witness has elected to testify under this statute, and he has been used, it would be a most unusual circumstance for the Government that used him to turn around and prosecute him." Hearings on H. R. 11157 and H. R. 12041 before Subcommittee No. 3 of the House Committee on the Judiciary, 91st Cong., 1st Sess., 47 (1969) (statement of Will Wilson).

question is what kind of return society will get on the prosecutor's investment in immunity. Once the prosecutor pays the immunity price, he will normally wish to probe deeply for evidence that will implicate the witness' criminal associates as thoroughly as possible. The primary law enforcement interest is to maximize the amount of information that the witness provides. A broad construction of the immunity grant serves that purpose; a narrow construction can only motivate witnesses to be as unresponsive as possible.[9]

Yet the Court suggests that the Government prosecutors take a different attitude towards immunized witnesses. Even though the Government itself has not promoted such a view

---

And a member of the Commission on Reform of the Federal Criminal Law, testifying in support of the statute, stated:

"I think there is one other thing about this that probably ought to be pointed out and that is that in most instances a grant of immunity is going to be made to a willing witness who isn't going to be prosecuted at all. That is probably the most important aspect of the whole matter. The prosecution will have just as much of an interest in protecting the interests of the person who has served the purposes of law enforcement in that regard as can be. As a consequence fears for the person who has willingly cooperated under the grant of immunity are, I think, probably more fanciful than real." *Id.*, at 53–54 (statement of Judge George Edwards).

As of October 1, 1976, these predictions had proved true. On that date, the Attorney in Charge at the Freedom of Information Privacy Unit of the Criminal Division of the Department of Justice wrote a letter to a research scholar. The letter reported that, while the Immunity Unit did not maintain statistics on the number of times witnesses had been subsequently prosecuted for matters disclosed in their immunized testimony, "if any such instances exist, they are rare." Note, 14 Am. Crim. L. Rev. 275, 282, n. 46 (1976).

[9] The Solicitor General made this point in a slightly different manner in his *Kastigar* brief:

"A practical reason for refraining from subsequent prosecution of a person who provides information is that the government has a vital interest in assuring the continued and unimpeded flow of information concerning criminal activities, and this interest may be furthered if a witness believes he will not be prosecuted." Brief for United States in *Kastigar* v. *United States*, O. T. 1971, No. 70–117, p. 34.

in the deposition proceedings in this case or by argument in this Court,[10] the opinion of the Court suggests that when a prosecutor immunizes a witness in order to obtain particular information, he harbors an intent to indict the witness afterwards and would therefore prefer that the witness remain in the same peril of prosecution as before being immunized.[11] Yet it defies human nature to presume that the witness would be just as cooperative during a 24-hour truce, knowing that hostilities will resume immediately thereafter, as he would be after signing a peace treaty.

Nor does the Court explain its assertion that applying the statute as it is written and as it was construed in *Kastigar* "in effect could invest the deponent with transactional immunity." *Ante,* at 260. Transactional immunity is not at all the issue here. Transactional immunity would require the prosecutor to forfeit an open-and-shut case that he had already built *independently.* Use immunity, as explained in *Kasti-*

---

[10] The Solicitor General regularly provides us with briefs *amicus curiae* in cases in which the Government's enforcement interests are implicated. He filed no such brief in this case and apparently asserted no objection to petitioners' use of the grand jury transcript as a basis for questioning of deposition witnesses, including respondent.

[11] See *ante,* at 260. The testimony quoted in n. 8, *supra,* describes this suggestion as "more fanciful than real." For a view that is more real than fanciful, see the testimony of the Assistant Attorney General for the Criminal Division of the Department of Justice in Hearings on H. R. 11157 and H. R. 12041, *supra* n. 8, at 41–42 (statement of Will Wilson). That testimony identified the prototypical situations where use immunity would be valuable: where the prosecutor wants to induce someone who is already in prison to testify about a different conspiracy in exchange for a reduction in the existing sentence; where a suspect's attorney offers his client's assistance "in exchange for some type of immunity from that crime which we are investigating"; where the prosecutor's investigation has focused on an agent of a principal "and we decide as a matter of policy that it is more important to prosecute the principal than the agent"; and where a minor actor refuses to testify out of loyalty to a major actor, as in the case of a bookie's customers—"[o]bviously the Government isn't interested in extensive prosecution of 200 or 300 people who simply placed bets, so you use the immunity grant there to make the case against the central person."

*gar* and as granted to the respondent, allows the prosecutor to retain that case.[12]   I have found absolutely no evidence, and the Court cites none today, to support the implicit suggestion that Congress substituted "use immunity" for "transactional immunity" in order to allow prosecutors to take advantage of subsequent repetitions of immunized testimony.[13]

The Court's reference to "transactional immunity" suggests a fear that ordering the respondent to answer a deposition question may somehow jeopardize legitimate efforts to prosecute him.   Consideration of the facts of this particular case demonstrates that the Court's apparent fear is baseless. Unless some prosecutor already has an independent basis for prosecuting the respondent—and nothing in the record suggests that any such independent basis exists—the Government has already agreed that he will not be prosecuted for engaging in illegal price discussions with Fred Renshaw and Dick Herman of the Alton Box Board.   If, at the deposition, he is required to confirm that such discussions took place,

---

[12] As the Solicitor General explained in *Kastigar*, there may be occasions in which an immunized witness is led unexpectedly (by cross-examination at trial, or by grand juror questions) to testify about a new crime, "with respect to which the prosecution may possess overwhelming evidence." Brief for United States in *Kastigar* v. *United States*, O. T. 1971, No. 70–117, p. 36.   Although the Government was willing to give " 'absolute immunity' as to any matter to which the witness testifie[d]" in "a limited area," the Government should not be made to abandon an independent case.   *Ibid.*

[13] The United States Attorneys' Manual, Title I, Ch. 11, p. 2 (revised Dec. 15, 1981), explains the real reasons why the Government prefers use immunity to transactional immunity:

"[T]hey have, under appropriate circumstances, significant advantages over former 'transactional immunity' statutes in that they provide no gratuity to a testifying witness, they encourage the giving of more complete testimony by proscribing [the] use of everything the witness relates, and they still permit a prosecution of the witness in the rare case where it can be shown that the supporting evidence clearly was obtained only from independent sources."

how can that confirmation affect his criminal liability? If some prosecutor has a demonstrably independent basis for proving the respondent's participation in the discussions, his confirmation will not make that basis any less demonstrably independent.[14] And if that prosecutor has an independent basis for showing that the respondent participated in the discussions, that basis will be no less demonstrably independent if the respondent is required to identify the time, place, and other persons who participated in the discussions.

Furthermore, one should not overlook the societal costs— law enforcement costs—of the Court's expansion of the Fifth Amendment. The public interest in obtaining the full and candid testimony of a witness with knowledge of the inner workings of a price-fixing conspiracy is both real and significant.[15] Conceivably, a relatively brief account of the basic structure of the conspiracy might have been sufficient to persuade the grand jury to indict other parties and also to persuade those defendants to plead guilty or to enter into some other settlement with the Government.[16] Even if a grand jury transcript is confined to a brief description of a price-

---

[14] In his argument in *Kastigar*, the Solicitor General seemed to assume that an adequate demonstration that evidence had an independent source would normally involve proof that the source antedated the grand jury testimony. See n. 5, *supra*. In this case respondent's grand jury testimony was given in 1978 and the deposition was taken in 1981. It would be much easier to prove that the basis for a possible future prosecution had a pre-1981 source than a pre-1978 source.

[15] The enforcement interest described in the text supplements the general public interest in accurate factfinding, an interest that is also hindered by the Court's holding. Cf. Lord Chancellor Hardwicke's oft-quoted phrase, "the public has a right to every man's evidence," 12 T. Hansard, Parliamentary History of England 675, 693 (1812), quoted in *Kastigar v. United States*, 406 U. S. 441, 443.

[16] It is not unusual to accept a civil consent decree or a modest penalty in exchange for the dismissal of criminal charges under the antitrust laws.

fixing arrangement, for example, the public interest may well be served by allowing private parties who have been injured thereby to inquire into the details of the arrangement.[17]

The Court assumes that the scope of the Fifth Amendment privilege in this case should be expanded in order to serve society's law enforcement interests. I do not accept this mode of Fifth Amendment interpretation. But even if I did, I would find the theoretical risk that compelled testimony could hamper a potential prosecution to be plainly outweighed by the enforcement interest in allowing the deposition to go forward. And, significantly, even the slight theoretical risk that concerns the Court is not presented by *this case*, in which no new incriminating information is called for by the deposition questions.

## III

The Court makes the curious argument that the Fifth Amendment privilege must extend to testimony that could not incriminate a witness because otherwise the witness will be put to the risk of "predicting" whether a court in a later criminal proceeding would agree that the testimony was

---

[17] The Court suggests, *ante*, at 259–260, that cross-examination somehow poses unique problems in this case. Yet it concedes that it is not unusual for a valid assertion of a Fifth Amendment privilege to inhibit cross-examination as to collateral matters such as credibility. *Ante*, at 260, n. 19. It is thus concerned only that cross-examination might not be allowed on matters about which the witness testified on direct examination because such cross-examination will produce information not elicited on direct. I do not understand why such cross-examination would not be allowed; even if the information were not itself elicited on direct, it would concern a matter about which the witness was required to testify on direct and would thus be derived from the prior immunized testimony in the same way as the direct examination. But even if it were possible that a valid assertion of the Fifth Amendment privilege might so restrict cross-examination that a deposition answer would be inadmissible at trial, that is surely not a sufficient reason to establish a *constitutional* privilege against giving the direct testimony.

within the scope of the immunity. *Ante,* at 261–262. I do not agree that the "risk" that troubles the Court is entitled to protection under the Fifth Amendment.

A witness in the respondent's chair at a deposition can do one of two things: he can answer or he can assert a Fifth Amendment privilege. If he answers, he is obviously more "at risk" under JUSTICE BLACKMUN's narrow view of the use immunity statute than under the broad one adopted in *Kastigar.* For that reason, the Court does not dispute the fact that if the respondent had answered the deposition questions in this case, his answers could not be used against him.[18] The Court and I part company, however, in reacting to the risks that the witness faces if he asserts a Fifth Amendment privilege.

If the court supervising the deposition concludes that an answer is not "directly or indirectly derived" from prior immunized testimony, it must uphold the assertion of the Fifth Amendment privilege under both my analysis and the Court's. If, on the other hand, the supervising court concludes that the answer is "directly or indirectly derived" from immunized testimony, I believe it must reject the asserted privilege. The Court disagrees, for two analytically distinct reasons.

First, the Court suggests that the supervising court might make a mistake in deciding whether the testimony is directly or indirectly derived. It suggests that in this case Judge Singleton might not have been able to "predetermine the decision of the court in a subsequent criminal prosecution on the

---

[18] It is true, of course, that a witness will risk having his extended testimony used against him later if he makes statements that are not derived from his grand jury testimony. But the assumption that counsel would not be able to identify those "danger areas" demeans the competence of our trial bar. The problem raised by such testimony is essentially the same as the problem presented when any witness testifies in a manner that might be exploited to uncover evidence against him. When in doubt, prudent counsel can always obtain an authoritative court ruling by having the witness assert the Fifth Amendment privilege.

question whether the Government has met its burden of proving that 'the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.'" *Ante,* at 261. The Court does not explain what sort of evidence the prosecutor might subsequently be able to produce that would show the answers to be "wholly independent"; indeed, it is difficult to conceive how such evidence could possibly exist in this case. More importantly, the Court does not explain why the risk of error in this situation is different from the identical risk that exists whenever a privilege is asserted. The Court's argument would require every trial judge always to honor a claim of privilege, no matter how obvious it may be that the claim lacks merit, to guard against being found wrong later.[19]

Second, the Court suggests, with JUSTICE MARSHALL, that it would be unfair to require the witness to answer because "'[f]urther incriminating evidence that is derived from compelled testimony cannot always be traced back to its source.'" *Ante,* at 262, n. 22, quoting *ante,* at 268. Yet such an argument applies with equal force to the entire concept of use immunity. Our holding in *Kastigar* rests squarely on the proposition that one may not assert a Fifth Amendment privilege on the basis of the risk that evidence might not be traced back to its source. Cf. *Kastigar,* 406 U. S., at 468–471 (MARSHALL, J., dissenting). Even if the Court were now prepared to retreat from that proposition, this case is surely not the proper vehicle. The respondent here was asked only to ratify or confirm facts that were already known. On this record, it clearly appears that the

---

[19] The Court is somewhat misleading when it discusses the risk that a trial judge may erroneously reject an assertion of a Fifth Amendment privilege in a paragraph that discusses risks borne by the witness. Such a risk is obviously borne by the government, which may not make use of testimony that is "wrongfully compelled" by a judge. *Maness* v. *Meyers,* 419 U. S. 449, 474 (WHITE, J., concurring in result). Cf. *Garrity* v. *New Jersey,* 385 U. S. 493, 500 (government may not use statements obtained under threat of removal from public office).

answers to the specific questions asked could not possibly provide any basis for prosecution, or even for investigation, beyond what was already provided by the grand jury testimony.[20]

In summary, it is perfectly clear on this record that the respondent's deposition testimony (a) would be protected by the statutory immunity; (b) could not be used against respondent in a subsequent criminal proceeding; and (c) could not provide a prosecutor with any information he does not already have.   A concern that a court might not decide some other case correctly cannot justify an incorrect disposition of the case before us.

I respectfully dissent.

---

[20] The Court also notes that requiring the respondent to speak increases the risk that he may reveal that he perjured himself before the grand jury, as well as the risk that he may be exposed to civil liability for his misdeeds.   *Ante,* at 262, n. 22.   But potential civil liability has never been held to establish a Fifth Amendment privilege.   Cf. *Ullmann* v. *United States,* 350 U. S., at 430–431; *Brown* v. *Walker,* 161 U. S. 591, 605–606. And respondent has never suggested that he asserted the privilege to avoid the risk of prosecution for perjury; the Court does not explain why that risk could not be evaluated case by case when and if it is asserted.