**George S. DAVIS, Petitioner,**

v.

**Kenneth G. LEHANE, Respondent.**

**No. Civ.A. 83–03676–WGY.**

United States District Court,
D. Massachusetts.

March 29, 2000.

Charles W. Rankin, Rankin & Sultan, Boston, MA, for George S. Davis, plaintiff.

Elisabeth J. Medvedow, Attorney General's Office, Criminal Bureau, Boston, MA, Gregory I. Massing, D. Dunbar Livingston, Special Assistant Attorney General, Office of the D.A. for Eastern District, Salem, MA, for Kenneth G. Lehane, Suffolk County Superior Court, Attorney General, Commonwealth, defendants.

*MEMORANDUM AND ORDER*

YOUNG, Chief Judge.

## I. INTRODUCTION

▮ On November 23, 1983, George C. Davis ("Davis"), a former attorney, filed this petition for a writ of habeas corpus.[1] He alleges that his 1978 convictions in Suffolk Superior Court, for conspiracy to commit arson and conspiracy to commit arson with intent to defraud an insurer, were the result of an unfair trial. Specifically, he alleges that the Commonwealth (1) deprived him of the right to interview an exculpatory witness before trial; (2) failed to disclose all the terms of a deal it made with its star witness; and (3) failed to disclose prior instances of perjury by the same government witness.

## II. FACTUAL BACKGROUND

In October and November of 1974, a series of fires destroyed an apartment building located at 37–41–43 Symphony Road in Boston. *See* Joseph M. Harvey and Richard J. Connolly, '*A Huge Conspiracy to Burn Suffolk County for Profit*', Boston Globe, Oct. 8, 1977, at 1; Michael Kenney, *The Key: Scarred Symphony Road*, Boston Globe, Oct. 18, 1977, at 1; Bob Keeley, Jim Morse, and John O'Neill,

*Arson for Profit: 20 Arraigned*, Boston Herald American, Oct. 18, 1977, at 1. Davis had owned the property at one time, but the owner on the date of the fires was D.D. & F. Trust, Inc., a corporation owned and operated by Dennis Liakos ("Liakos"), an attorney, and Francis Fraine ("Fraine"), a wire inspector for the city of Boston. On October 13, 1977, a Suffolk County grand jury indicted Davis, Liakos, James DeFuria ("DeFuria"),[2] and George Lincoln ("Lincoln")[3] in connection with the fires. The government named Fraine as an unindicted co-conspirator.

Lincoln, who actually set the fires, testified at trial that Davis was directly involved in the arson conspiracy. Lincoln's testimony directly contradicted that of Fraine, who testified before the grand jury that Davis had nothing to do with the arson plan. Fraine initially agreed to cooperate with Davis' trial counsel, Frank J. McGee ("McGee"), but later refused to be interviewed by the defense.

Despite not having interviewed Fraine before trial, McGee felt compelled to call him as a witness on the basis of his grand jury testimony. On cross-examination, the prosecutor, Stephen Delinsky ("Delinsky")[4] effectively impeached Fraine's credibility with evidence of prior bad acts about which the defense had no knowledge.

On August 23, 1978, after a three week jury-waived trial, Davis was convicted of conspiracy to commit arson and conspiracy to commit arson with intent to defraud an insurer. As to the latter charge, Justice Paul Garrity[5] sentenced Davis to two and

---

1. This Court may consider Davis' petition even though he is no longer in custody. *See Carafas v. LaVallee*, 391 U.S. 234, 237–40, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968).

2. DeFuria was a lieutenant in the State Fire Marshall's Office. He was convicted at trial, but did not appeal. *See Commonwealth v. Davis*, 13 Mass.App.Ct. 179, 183 n. 4, 431 N.E.2d 251 (1982).

3. The Commonwealth never moved for trial against Lincoln, a self-described professional arsonist.

4. Assistant Attorney General of the Commonwealth of Massachusetts, 1977 – 1982.

5. Justice of the Housing Court of the City of Boston, 1972 – 1976, Justice of the Superior Court, 1976 – 1984. The case had originally been assigned to Justice Thomas E. Dwyer, Justice of the Superior Court, 1970 – 1986,

a half years in the Suffolk County House of Correction (three months committed, remainder suspended), two years of probation, and thirty hours per week of community service for nine months during the probation period. As to the former, Davis received two and a half years in prison. This sentence was suspended, and he was ordered to serve two years of probation with a special condition that he pay restitution in the amount of $10,000.

Davis served his three months from September 27, 1978, to December 23, 1978, on which date he began serving his two year (730 days) term of probation. On May 11, 1979, (four months and eighteen days, or 140 days, later), the Massachusetts Appeals Court stayed Davis' sentence pending appeal. *See* Pet'r Mem., Ex. D. On June 22, 1979, Davis filed a motion for a new trial asserting, inter alia, the claims now raised in this habeas petition. On November 20, 1979, Justice Garrity held a non-evidentiary hearing with respect to the motion for a new trial and denied it on March 20, 1980. *Commonwealth v. Davis,* No. 014459 (Mass.Super.Ct. Mar. 20, 1980) (Garrity, J.); Pet'r Mem., Ex. 1. The Massachusetts Appeals Court affirmed Davis' convictions on February 10, 1982, *see Commonwealth v. Davis,* 13 Mass.App.Ct. at 180, 431 N.E.2d 251, noting that "there [was] support in the record for" Justice Garrity's conclusion about Fraine, and that even if Justice Garrity were wrong, Davis' inability to interview Fraine did not require a new trial. The Supreme Judicial Court denied Davis' petition for further appellate review. *See Commonwealth v. Davis,* 385 Mass. 1103, 441 N.E.2d 1043 (1982). After the Supreme Judicial Court denied Davis' petition for further appellate review, the stay of probation was revoked on April 20, 1982, and Davis began to serve the remainder of his probation (nineteen months and eleven days, or 590 days). Davis filed this habeas petition on November 23, 1983.

Regional Administrative Justice, 1983 – 1986, but he recused himself from this jury-waived

## III. COMMONWEALTH'S MOTION FOR RECONSIDERATION

On April 6, 1984, the Commonwealth filed a motion to dismiss this petition for lack of subject matter jurisdiction asserting that Davis was not "in custody" for purposes of habeas corpus relief on November 23, 1983.

### A. *Relevant Background*

According to Davis, his probation ended on December 2, 1983 (590 days after April 20, 1982), which was nine days *after* he filed his habeas petition. The Commonwealth, however, contends that Davis' probation ended on November 20, 1983, three days *before* he filed his petition for writ of habeas corpus. The Commonwealth relies on a probation contract dated September 27, 1983, and signed by Davis which states that the probation period would end on November 20, 1983, and that Davis received five months (rather than four months and eighteen days) of credit for time served between December 23, 1978, and May 11, 1979. Davis argues he is not bound by the erroneous five–month credit because it was granted by a probation officer rather than the court. The Commonwealth counters that the five-month credit was given by the court, not the probation officer. *See* Morrill Aff. at ¶¶ 4–5.

On the Commonwealth's motion to dismiss for lack of subject matter jurisdiction, Judge Skinner agreed with Davis. In his Memorandum and Order, Judge Skinner stated that "[a] probation officer cannot, whether through ignorance, good will, or ill will, alter the terms of a sentence imposed by a judge of the commonwealth." *See Davis v. Lehane,* No. 83–3676–S (D.Mass. July 26, 1984); Pet'r Mem., Ex. J. Judge Skinner also noted that the Commonwealth's use of five months as a rounded-off substitute for four months and eighteen days "show[ed] a very casual disregard of

case due to his prior involvement in presiding over the cases of other defendants.

its obligations to this court," and "call[ed] the attention of the parties to Fed.R.Civ.P. 11." *Davis v. Lehane,* No. 83–3676–S at 3–4.

On April 24, 1984, Davis filed a motion for attorney's fees pursuant to Fed. R.Civ.P. 11. Judge Skinner granted the motion on April 8, 1985 and the Commonwealth appealed. On June 11, 1985, the First Circuit stayed the appeal pending an appeal from the underlying habeas action. *See* Resp't Mem., Ex. E. Nine years later, on September 27, 1994, the First Circuit dismissed the appeal for lack of prosecution after the Commonwealth failed to respond to an earlier order to show cause or file a status report. *See id.* at Ex. F. One day later, the Commonwealth filed a motion to reinstate the appeal, which the First Circuit denied on October 24, 1994.

On February 22, 1995, Judge Wolf granted the parties' motion to reopen the habeas action. On October 17, 1995, Judge Wolf transferred the case to Magistrate Judge Collings, who in turn transferred the case to Chief Magistrate Judge Alexander two weeks later. Two years later, Chief Magistrate Judge Alexander ordered the parties to appear at a status conference. At the status conference, the Commonwealth announced its plan to file a motion for reconsideration of Judge Skinner's denial of the motion to dismiss for lack of subject matter jurisdiction. The Commonwealth filed the motion for reconsideration of Judge Skinner's ruling on October 22, 1997. On December 2, 1997, Chief Magistrate Judge Alexander transferred the case back to Judge Wolf, who later transferred the case to this Court on March 2, 1999.

The motion for reconsideration is now before this Court.

### B. *Standard for Motion for Reconsideration*

■ A federal district court has the discretion to reconsider interlocutory orders and revise or amend them at any time prior to final judgment. *See Bethlehem Steel Export Corp. v. Redondo Constr. Corp.,* 140 F.3d 319, 321 (1st Cir.1998) (holding that a district court judge to whom a case had been reassigned could grant the defendant's motion for summary judgment after the previous judge had denied the motion); *Perez–Ruiz v. Crespo–Guillen,* 25 F.3d 40, 42 (1st Cir.1994) ("Interlocutory orders, including denials of motions to dismiss, remain open to trial court reconsideration, and do not constitute the law of the case."). The Supreme Court, however, has admonished that "courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (quoting *Arizona v. California,* 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 75 L.Ed.2d 318 [1983]).

■ When faced with a motion for reconsideration, a district court must balance the need for finality against the duty to render just decisions. *See McCoy v. Macon Water Auth.,* 966 F.Supp. 1209, 1222 (M.D.Ga.1997). In order to accommodate these competing interests, a court should grant a motion for reconsideration of an interlocutory order only when the movant demonstrates (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error of law in the first order. *See id.* at 1222–23; 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure,* § 4478, at 789–90 (1981).

### C. *Analysis*

■ The Commonwealth has not even attempted to predicate its motion for reconsideration on a change in controlling law, the existence of newly available evidence, or clear error by Judge Skinner. A comparison of the Commonwealth's memorandum in support of its original motion with that of its motion for reconsideration

reveals that the latter simply rehashes the arguments set forth in the former. This is not enough to merit reconsideration. *See In re Wedgestone Fin.*, 142 B.R. 7, 8 (Bankr.D.Mass.1992) ("A motion for reconsideration is not a means by which parties can rehash previously made arguments."); *see also Froudi v. United States*, 22 Cl.Ct. 290, 300 (1991) ("Generally, a motion for reconsideration is not a vehicle for giving an unhappy litigant an additional chance to sway the judge, nor is it intended to allow a party to make arguments already presented to, and rejected by, the court."); *Renfro v. City of Emporia*, 732 F.Supp. 1116, 1117 (D.Kan.1990) ("A party's failure to present his strongest case in the first instance does not entitle him to a second chance in the form of a motion to amend."), *aff'd*, 948 F.2d 1529 (10th Cir. 1991), *cert. dismissed*, 503 U.S. 915, 112 S.Ct. 1310, 117 L.Ed.2d 510 (1992).

In its first attempt to dismiss Davis' petition for lack of subject matter jurisdiction, the Commonwealth argued that Davis was not "in custody" on November 23, 1983 because his probationary term had expired on November 20, 1983. *See* Pet'r Mem., Ex. L at 4–5. The main thrust of the Commonwealth's brief was that Davis had signed a probation contract on September 27, 1983, that reflected November 20, 1983, as the last day of his probationary period. *See id.* at 2 n. 1. To support its argument, the Commonwealth relied on the affidavit of Davis' probation officer, Richard A. Morrill ("Morrill"). *See id.*

In its memorandum in support of its motion for reconsideration, the Commonwealth again argues that Davis was not in custody on November 23, 1983 because the probation contract Davis signed on September 27, 1983 specified November 20, 1983 as the last day of probation. *See* Resp't Mem. at 4. This time around, the Commonwealth relies on a supplemental affidavit from Morrill, which states that the September 27 probation agreement "reflected the order of the court granting him five months credit toward his proba-

tionary period." Supp.Morrill.Aff. at ¶ 9. The Commonwealth offers no explanation as to why it did not present Morrill's additional statements at the time of the first motion. Given that Morrill provided an affidavit in support of the 1984 motion, the most charitable reason for the Commonwealth's failure to elicit the statements contained in the second affidavit is inadvertence. This factor cuts against the Commonwealth's motion for reconsideration. *See Aini v. Sun Taiyang Co., Ltd.*, 174 F.R.D. 327, 330 (S.D.N.Y.1997), *aff'd sub nom. Topiclear Beauty v. Sun Taiyang Co., Ltd.*, 159 F.3d 1348, 1998 WL 536780 (2nd Cir.1998); *McCoy*, 966 F.Supp. at 1223; *Mateo v. M/S KISO*, 805 F.Supp. 761, 786 (N.D.Cal.1991).

The Commonwealth also now relies on a letter Morrill received from J. Bryan Riley, the director of Massachusetts Half-Way Houses, Inc., which specifies November 20, 1983 as the last day of Davis' probation. *See* Resp't Mem., Ex. J. That letter is dated January 27, 1984, and was therefore available to the Commonwealth when it filed its original motion to dismiss on April 6, 1984. The Commonwealth offers no explanation as to why it did not present the letter to Judge Skinner or why this Court should entertain the letter on its motion for reconsideration. Accordingly, this Court need not reconsider Judge Skinner's ruling, notwithstanding the addition of the letter to the Commonwealth's presentation. *See Waltman v. International Paper Co.*, 875 F.2d 468, 473–74 (5th Cir.1989) (holding that a district court did not abuse its discretion when it denied a motion for reconsideration that relied on materials available to the movant at the time of the original motion and where movant did not give any explanation as to why she did not rely on those materials in the first instance).

Moreover, this Court rejects the Commonwealth's motion for reconsideration because it waited thirteen years to file it. In *Aini*, the court noted that even if the plaintiff's failure to raise an argument at

trial were excusable, reconsideration was inappropriate because the plaintiff waited eight months before filing its motion for reconsideration. *See Aini,* 174 F.R.D. at 330 (referring to an eight month delay as "extraordinary"); *United States v. Badr,* 666 F.Supp. 37, 38 (E.D.N.Y.1987) (denying motion for reconsideration because it was filed one and a half years after the underlying motion had been denied). Given these precedents, a thirteen year delay between the original motion and the motion for reconsideration counsels denial of this motion for reconsideration.

■ "The motion for reconsideration is not an opportunity for a party to improve upon his arguments or try out new arguments; nor is it properly a forum for a party to vent his dissatisfaction with the Court's reasoning." *McCoy,* 966 F.Supp. at 1223. Rather, in order for a court to reconsider, "there must be a reason why the court should reconsider [a] prior decision, and [the movant] must set forth facts or law of a strongly convincing nature to induce the court to reverse [the] prior decision." *Sussman v. Salem, Saxon & Nielsen, P.A.,* 153 F.R.D. 689, 694 (M.D.Fla.1994). In this case, the Commonwealth waited thirteen years to file a motion for reconsideration. It was hardly worth the wait, as the Commonwealth has not even come close to satisfying its obligation. Accordingly, this Court denies the motion for reconsideration of the motion to dismiss for lack of subject matter jurisdiction.

## IV. DAVIS' MOTION FOR EVIDENTIARY HEARING

In his opinion denying Davis' motion for a new trial, Justice Garrity concluded that "Fraine refused of his own volition to submit to an interview." *Davis,* No. 014459, at 11. On appeal, the Massachusetts Appeals Court held that "[t]here is support in the record for this finding." *Davis,* 13

Mass.App.Ct. at 184, 431 N.E.2d 251. Davis now asks this Court to conduct an evidentiary hearing to determine whether Fraine in fact voluntarily refused to submit to an interview or whether the Commonwealth impermissibly interfered with Davis' right to approach Fraine and request an interview.

■ Because Davis filed his petition for habeas relief before Congress enacted the Anti–Terrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 ("AEDPA"), the issue of whether this Court must accept Justice Garrity's factual finding as correct or whether it may hold an evidentiary hearing is governed by the pre-AEDPA version of 28 U.S.C. § 2254(d). *See Lindh v. Murphy,* 521 U.S. 320, 334–37, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).[6]

The pre-AEDPA version of section 2254(d) provided in relevant part:

> In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody ..., a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the application for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—
>
> (1) that the merits of the factual dispute were not resolved in the State court hearing;
>
> (2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

6. Whether a witness was under pressure from government officials is a question of fact subject to the statutory presumption of correct-

ness. *See Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) *(Sumner II).*

(3) that the material facts were not adequately developed at the State court hearing;

. . . . .

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, ·is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record.

28 U.S.C. § 2254(d) (1994).

Davis argues that this Court *must* reject Justice Garrity's factual finding and hear evidence anew because Justice Garrity did not hold an evidentiary hearing with live witnesses.[7] At the non-evidentiary hearing held on November 20, 1979, Delinsky,, Thomas Reilly,[8] the attorney for Fraine ("Reilly"), and the attorneys for Davis and Liakos addressed the court concerning certain August 3, 1978 phone calls between Reilly and Delinsky and the impact of those calls on Fraine's decision to meet with Davis' trial counsel.[9] *See* Tr. at 26–50. Reilly and Delinsky each explained his recollection of events. Liakos' attorney, James Sullivan ("Sullivan"), explained how Liakos and Davis were prejudiced by their inability to interview Fraine before trial. Davis' attorney, Walter Hurley,[10] adopted Sullivan's arguments in full. *See id.* at 34.

Based on these arguments, Justice Garrity quashed subpoenas for Delinsky, Fraine, Reilly, and Assistant Attorney General John Bonistalli. *See id.* at 45, 51, 53. On March 20, 1980, Justice Garrity issued a memorandum denying the motion for a new trial and concluding that Fraine decided of his own accord not to meet with defense counsel before trial. *See Davis,* No. 014459, at 11.

■ The November 20, 1979 hearing satisfies Section 2254(d) even though it did not include sworn testimony from live witnesses. In *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) (*Sumner I*), the Supreme Court explained that Section 2254(d) does not "specify any procedural requirements that must be satisfied for there to be a 'hearing on the merits of a factual issue,' other than that the habeas applicant and the state or its agent be parties to the state proceeding and that the state-court determination be evidenced by a 'written finding, written opinion, or other reliable and adequate written indicia.'" *Id.* at 546–47, 101 S.Ct. 764; *accord Livingston v. Johnson,* 107 F.3d 297, 303 (5th Cir.1997) (holding that the state court's factfinding procedure was adequate even though it did not hold an evidentiary hearing because "'[h]earing,' as used in § 2254[d], does not require a trial-type hearing at which live testimony is presented and the accused has the opportunity to cross-examine witnesses."), *cert. denied,* 522 U.S. 880, 118 S.Ct. 204, 139 L.Ed.2d 141 (1997); *Toulson v. Beyer,* 827 F.Supp. 307, 313 (D.N.J.1993) ("While the state court did not conduct a formal evidentiary hearing on the existence of the pre-trial threats against the two witnesses, such a separate hearing is not required

---

7. In Massachusetts, a judge may rule on a motion for a new trial "on the basis of the facts alleged in the affidavits without further hearing...." Mass.R.Crim.P. 30(c)(3).

8. Later District Attorney for the County of Middlesex, 1991 – 1999, and presently Attorney General of the Commonwealth of Massachusetts.

9. Delinsky and Reilly addressed the court as attorneys (Delinsky on behalf of the Commonwealth and Reilly on behalf of Fraine), rather than as sworn witnesses.

10. Later Justice of the Municipal Court of the City of Boston, 1984 – 1991.

under the statute."), *aff'd* 30 F.3d 1488 (3rd Cir.1994).

■ Given that Davis received an adequate "hearing" as required by Section 2254(d), *see Sumner I*, 449 U.S. at 546, 101 S.Ct. 764, "the burden rests on [Davis] . . . to establish by 'convincing evidence' that the factual determination of the State court was erroneous," *id.* at 551, 101 S.Ct. 764 (quoting 28 U.S.C. § 2254[d]). In determining whether a petitioner has met this burden, "the district court *may* conduct an evidentiary hearing to resolve material factual disputes, pursuant to Rule 8(a) of the Rules Governing Habeas Corpus Cases." *Toulson*, 827 F.Supp. at 315 (emphasis added); *accord Lonchar v. Thomas*, 517 U.S. 314, 326, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1997) ("[T]he district court is afforded a degree of discretion in determining whether to hold an evidentiary hearing."); *Pagan v. Keane*, 984 F.2d 61, 64 (2d Cir.1993) (noting that "a District Court retain[s] the power to hold a hearing even though one [is] not required"). Thus, while this Court is not obligated to hold an evidentiary hearing, it is well within its discretion to do so.

■ For the following reasons, this Court exercises its discretion and grants Davis' motion for an evidentiary hearing.

First, although Davis' hearing in the Superior Court was adequate under the Supreme Court's ruling in *Sumner I*, it was not as full or fair as an evidentiary hearing would have been.[11] Justice Garrity quashed the subpoenas for Reilly and Delinsky even though they admitted that their memories were incomplete. Justice Garrity quashed the subpoena for Fraine despite the fact that he had "no memory of Mr. Frane's [sic] testimony." Tr. at 28. In fact, Justice Garrity, the factfinder at trial, admitted on the record that "[his] memory of the trial [was] very, very dim." *Id.* at 58. He also stated that he felt "a lot

of personal psychological pressure to cause this to come to a conclusion one way or another," *id.* at 18, and that "nobody . . . wants to get this over with more than I do," *id.* In his written opinion, Justice Garrity devoted just two sentences to the issue of whether Fraine's refusal to submit to an interview resulted from Delinsky's comments to Reilly. *See Davis*, No. 014459, at 11.

Second, the alleged prosecutorial misconduct in this case raises substantial constitutional questions about the fairness of Davis' trial. *See Kines v. Butterworth*, 669 F.2d 6, 9 (1st Cir.1981) (government interference with defendant's right to interview witnesses violates due process), *cert. denied*, 456 U.S. 980, 102 S.Ct. 2250, 72 L.Ed.2d 856 (1982). Delinsky concedes that he told Reilly that Fraine ought not meet with defense counsel, but the parties dispute the tenor of these statements and the exact nature of Delinsky's retraction of them. Moreover, Fraine's deposition testimony conflicts with the testimony he gave at trial. An evidentiary hearing affords this Court an opportunity to decide exactly what was said and what impact it had on Fraine's decision to meet with Davis' trial counsel.

Finally, Davis has waited 17 years for a federal court to address his petition. During that time, the petition has come before at least three district court judges, two magistrate judges, and the First Circuit Court of Appeals. Moreover, the Massachusetts Superior Court has been afforded an opportunity to conduct its own further evidentiary hearing and has declined. *See* Letter from Honorable Robert Mulligan, Chief Justice of the Superior Court, to Elizabeth Medvedow, Assistant Attorney General (August 18, 1999). While the evidentiary hearing in this Court has prolonged this case even further, it seemed that justice counseled this Court to make

---

11. Indeed, the legislative history of Section 2254(d) makes clear that one of the purposes of the statute was to encourage state courts to hold evidentiary hearings in post-conviction cases involving state prisoners. *See* S.Rep. No. 1797 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3663 (*cited in In re Parker*, 423 F.2d 1021, 1024 [8th Cir.1970]).

the final resolution of Davis' petition worth the wait.

Accordingly, this Court granted Davis' motion for an evidentiary hearing on the issue of Fraine's decision not to be interviewed by Davis' defense counsel before trial. *See Pagan* 984 F.2d at 64–65 (circumstances supporting grant of discretionary hearing include the existence of a factual dispute, the strength of the proffered evidence, the thoroughness of the prior proceeding, and the nature of the state court determination).[12]

## V. EXHAUSTION

In the midst of the evidentiary hearing ordered just above, the Commonwealth for the first time moved to dismiss on the ground that Davis failed to exhaust state remedies with respect to his claim of prosecutorial interference with his ability to interview Fraine. The Commonwealth admits that Davis adequately raised the Fraine issue both in his motion for new trial in the Superior Court as well as his subsequent appeal to the Massachusetts Appeals Court. Concentrating on Davis' Petition for Leave to Obtain Further Appellate Review ("FAR petition") filed in the Supreme Judicial Court pursuant to Mass.R.App.P. 27.1, the Commonwealth contends that Davis there abandoned the Fraine issue to such a degree that it could not fairly be said to have been presented to the state's high court for review.

The rule of comity between state and federal courts requires that state courts be provided the initial opportunity to review claims of constitutional error arising from state criminal prosecutions. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 119 S.Ct. 1728, 1732, 144 L.Ed.2d 1 (1999); *see also* 28 U.S.C. § 2254(b)(1) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that ... (A) the applicant has exhausted the remedies available in the courts of the State...."). "This rule of comity reduces friction between the state and federal court systems by avoiding the 'unseem[liness]' of a federal district court's overturning a state court conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance." *O'Sullivan,* 119 S.Ct. at 1732 (quoting *Darr v. Burford,* 339 U.S. 200, 204, 70 S.Ct. 587, 94 L.Ed. 761 [1950]). Consequently, "a federal court should not consider questions posed in a habeas petition until the 'power of the highest state court in respect to such questions' has been exhausted." *Mele v. Fitchburg Dist. Ct.,* 850 F.2d 817, 819 (1st Cir.1988) (quoting *United States ex rel. Kennedy v. Tyler,* 269 U.S. 13, 17, 46 S.Ct. 1, 70 L.Ed. 138 [1925]). Thus, after the intermediate appellate court resolves an appeal, the petitioner must present his claims to the state supreme court in order to satisfy the exhaustion requirement. *See O'Sullivan,* 119 S.Ct. at 1732–33. A habeas petitioner "bears a heavy burden to show that he fairly and recognizably presented to the state courts the factual and legal bases of this federal claim." *Adelson v. DiPaola,* 131 F.3d 259, 262 (1st Cir.1997); *see also Martens v. Shannon,* 836 F.2d 715, 717 (1st Cir.1988) ("The ground relied upon must be presented face-up and squarely; the federal question must be plainly defined."). "To carry this burden, the petitioner must demonstrate that he tendered each claim 'in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of the federal question.'" *Adelson,* 131 F.3d at 262 (quoting *Scarpa v. DuBois,* 38 F.3d 1, 6 [1st Cir.1994], *cert. denied,* 513 U.S. 1129, 115 S.Ct. 940, 130 L.Ed.2d 885 [1995]). Myriad channels exist by which petitioners can accomplish fair presentment of a federal constitutional claim to a

---

12. In "the interests of judicial economy," this Court accepted evidence relating to Davis' *Brady* claims at such hearing as well. *Stano v. Dugger,* 901 F.2d 898, 905 (11th Cir.1990) (en banc).

state court. *See Nadworny v. Fair,* 872 F.2d 1093, 1097–98 (1st Cir.1989). When the issue turns on whether the claim was fairly presented to the Massachusetts Supreme Judicial Court, courts must look to the four corners of the FAR petition in order to resolve the exhaustion inquiry. *See Mele,* 850 F.2d at 823. In examining the FAR petition, courts ought look for federal constitutional law "trappings," i.e., "specific constitutional language, constitutional citation, appropriate federal precedent, substantive constitutional analogy, argument with no masking state-law character, and the like." *Nadworny,* 872 F.2d at 1101. The First Circuit has declined to take a "crabbed reading" of the "four corners" language in *Mele,* holding that where a petitioner has consistently asserted his constitutional claim throughout the state appellate process, his earlier filings may have "provided a backdrop against which his later filings had to be viewed." *Scarpa,* 38 F.3d at 7 & n. 3.

Here there is no question—and the Commonwealth wisely admits—that Davis raised the Fraine issue both in his motion for new trial in the Superior Court and in his brief to the Massachusetts Appeals Court. In particular, in his motion for new trial, Davis asserted a federal due process claim regarding intimidation of witnesses and accompanied the motion with affidavits attesting to the factual basis for the charge of prosecutorial interference with access to Fraine. Then, in his brief to the Massachusetts Appeals Court, Davis specifically cited federal precedent addressing this issue. In responding to the matter of access to Fraine, the Massachusetts Appeals Court decision contained numerous citations to both federal precedent and state court decisions which were based on federal due process principles.

In the FAR petition, Davis specifically noted the factual underpinnings of his claim: "[T]he prosecutors suppressed the fact that Fraine ... refused to be interviewed by the defendants because of threats by Delinsky.... " Pet'r's Mem.Ex. A at 24. Davis focused his argument in the FAR petition, however, on the failure of the trial justice to hold an evidentiary hearing regarding this and other suppression claims. *See id.* at 25. Davis characterized his claims as "allegations of constitutional violations," "allegations of constitutional dimensions," and as a "Due Process" violation contrary to *United States v. Dansker,* 565 F.2d 1262 (3d Cir.1977) (holding that where affidavits raise a genuine issue of material fact as to a *Brady* claim, an evidentiary hearing should be conducted), *cert. dismissed,* 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978). *See* Pet'r's Mem.Ex. A at 25, 26. Finally, he appended to the FAR petition the Massachusetts Appeals Court decision which specifically addressed the Fraine issue and cited both federal precedent and several state court decisions based on federal due process principles.

In light of these facts, Davis has done enough to present his claim to the Supreme Judicial Court. He explicitly alleged the factual basis of his claim and identified the guarantee of due process as the legal framework in support of his claim. While it is true that the FAR petition approaches the issue from a slightly unique angle, i.e., requesting an evidentiary hearing to examine the allegation, some "reformulation" of the legal claim alleged in the state courts is permissible as long as the core issue has been presented. *See Lanigan v. Maloney,* 853 F.2d 40, 44 (1st Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989); *Watkins v. Callahan,* 724 F.2d 1038, 1041 (1st Cir.1984) (holding that where petitioner argued in the state court system that certain statements should be suppressed, his federal claim that an evidentiary hearing should have been held to determine who initiated these conversations was adequately presented). Furthermore, as the First Circuit explained in *Scarpa,* earlier state court filings by a *habeas* petitioner necessarily focus the lens through which later filings have to be viewed. *See Scar-*

*pa,* 38 F.3d at 7. Here, this Court views Davis' FAR petition in light of his new trial motion and intermediate appellate court brief fully elucidating the Fraine issue. As to Davis' appending the Massachusetts Appeals Court decision to the FAR petition, however, it is true that mere attachment does not incorporate all of the arguments addressed in the decision into the FAR petition. *See Mele,* 850 F.2d at 823 (holding that where petitioner otherwise wholly abandoned issue in the FAR petition's body, merely appending Massachusetts Appeals Court decision which addressed issue was insufficient). But here, where Davis has demonstrated that the record of his new trial motion in the Superior court should have informed the Supreme Judicial Court of the contours of the Fraine issue, the attachment of the opinion further supports this Court's ruling that "a reasonable jurist would have been alerted to the existence of the federal question." *Adelson,* 131 F.3d at 262 (quoting *Scarpa,* 38 F.3d at 6). Therefore, the Court holds that Davis has satisfied the fair presentment requirement. Because the Commonwealth's reading of the FAR petition and its interpretation of relevant case law is unduly cramped, its motion to dismiss on exhaustion grounds is denied.

## VI. THE MERITS

Finally, having cleared away seventeen years of procedural underbrush, this Court at last conducted a thorough evidentiary hearing on the merits—and the result is very much an anticlimax because the broad outlines of the material facts have been known since the hearing on Davis' motion for a new trial in 1979.

### A. *The Facts*

The Court finds the following facts by clear and convincing evidence:

In the federal system the grant of witness immunity is totally the prerogative of the executive, *see* 18 U.S.C. §§ 6002, 6003; *Pillsbury Co. v. Conboy,* 459 U.S. 248, 261, 103 S.Ct. 608, 74 L.Ed.2d 430 (1983) ("No court has authority to immunize a witness. That responsibility ... is peculiarly an executive one."); *United States v. Graham,* 548 F.2d 1302, 1314 (8th Cir.1977). Judicial involvement is limited to determining that the executive has taken the requisite procedural steps, *see Ullmann v. United States,* 350 U.S. 422, 434, 76 S.Ct. 497, 100 L.Ed. 511 (1956); *United States v. Sharp,* 920 F.2d 1167, 1171 (4th Cir.1990); *United States v. Hooks,* 848 F.2d 785, 802 (7th Cir.1988); *In re Grand Jury Proceedings,* 882 F.Supp. 1165, 1168–69 (D.Mass. 1995), and witness immunity is routinely the subject of plea negotiations, *see* Graham Hughes, *Agreements for Cooperation in Criminal Cases,* 45 Vand.L.Rev. 1, 4–12 (Jan.1992); Robert E. Bloch, et al., *Representing Corporate Employees During an Antitrust Grand Jury Investigation,* 56 Antitrust L.J. 901, 925 (1988). Criminal cases brought in the Commonwealth of Massachusetts, however, are proved the old fashioned way and the grant of witness immunity is very much the exception, reserved for only the special case and requiring the approval of a single justice of the Massachusetts Supreme Judicial Court.[13] *See* Mass.Gen.Laws ch. 233 § 20E.

So it was here. The grant of witness immunity to Fraine was hardly routine either to prosecutors Delinsky and Bonistalli or to defense counsel Reilly. Each proceeded carefully, working out a protocol for Fraine's pre-trial preparation by the Commonwealth which satisfied Reilly that his client's immunity would not be jeopardized. It is evident that Fraine had a continuing concern about the viability of his immunity deal and desired the continued support of a Major Regan of the Massachusetts State Police. Still, after Fraine had immunity it became increasingly apparent that, as so often happens, Fraine's

---

**13.** Since the time of Davis' trial, the statue has been amended to allow the granting of witness immunity by a justice of any of the Supreme Judicial Court, the Appeals Court or the Superior Court. *See* St.1998 c. 188, § 4.

testimony would not be nearly as helpful to the Commonwealth's case as had originally been hoped. Indeed, when called before the grand jury, Fraine generally exonerated Davis. Thereafter, Delinsky's predecessor as prosecutor, one Henry Wise, "leaned hard on [Fraine]" in order to elicit testimony more favorable to the Commonwealth. *Commonwealth v. Davis,* 13 Mass.App.Ct. at 183, 431 N.E.2d 251. It is against this background that the key telephone conversations between Delinsky and Reilly must be evaluated.

Davis' counsel approached Reilly and asked to interview Fraine. Reilly conferred with Fraine, who agreed. In Fraine's presence, Reilly then telephoned Delinsky to inform him of the situation, leaving a message that defense counsel wished to interview Fraine. Shortly thereafter, Delinsky called back and spoke with Reilly.[14] Delinsky told Reilly he would "not allow" Fraine to talk to defense counsel. Delinsky was "very upset" and "implied repercussions" if Fraine went ahead. Delinsky reminded Reilly that Fraine and Major Regan "liked each other" and told Reilly that he'd remove the Major as Fraine's handler. He finished by saying that Fraine would get "no protection" from Massachusetts authorities relative to unrelated charges pending against Fraine in Ohio.[15]

Reilly proceeded to counsel Fraine concerning Delinsky's position. While this was going on, Delinsky called a second time and spoke with Reilly. He assured Reilly that Fraine was free to talk to defense counsel and that Fraine "should do what he has to do." The fair and reasonable inference from both Delinsky's and Reilly's

testimony at the hearing is that, insofar as words alone could do it, Delinsky withdrew any sting from his first call.

Fraine decided not to speak to defense counsel, Davis was convicted as recounted above, and Delinsky ultimately and properly informed the Ohio court of Fraine's cooperation as agreed.

### B. *Analysis*

Had it stood alone, this Court would have little difficulty in finding that Delinsky's first call interfered with Davis' due process right to interview witnesses. *Kines v. Butterworth,* 669 F.2d at 9. The more interesting question is whether Delinsky could "take it all back" by his second call. It is true, of course, that, as Justice Garrity found, Fraine later decided not to be interviewed by Davis' counsel of his own volition free of any then-present duress. Yet, the analysis cannot end here. Rather, the dispositive question is whether, but for Delinsky's first telephone call, Fraine would have gone ahead with the interview.

On this latter point—having conducted a full evidentiary hearing—this Court has access to relevant data not before the courts of the Commonwealth, most particularly Reilly's contemporaneous handwritten notes which virtually compel the inference that Delinsky's tone in the initial telephone call was hostile and implied repercussions if Fraine went ahead with an interview by defense counsel. This Court finds by clear and convincing evidence that Delinsky's later telephone call did not dissipate the taint of his earlier "short-lived impropriety," as the Massa-

**14.** While the substance of this telephone conversation is potentially dispositive of this *habeas* petition, it is not surprising that after seventeen years memories have dimmed. While Delinsky readily agrees he may have overstepped the line, he remembers the conversation as rather innocuous. Reilly has little direct memory of the events. Fraine's more lurid account of Reilly's end of the conversation and the recounting of it to him thereafter are not credible. The findings in

the text are based primarily on Reilly's contemporaneous handwritten notes.

**15.** This last sally was of little legal moment to Reilly who well understood that Massachusetts authorities could afford Fraine no "protection" in the Ohio proceedings. He and Fraine did, however, hope that Delinsky would inform the court in Ohio of Fraine's cooperation in Massachusetts.

chusetts Appeals Court termed it. *Commonwealth v. Davis*, 13 Mass.App.Ct. at 184, 431 N.E.2d 251. Moreover, this Court finds by clear and convincing evidence that, had Delinsky not initially overstepped, Fraine would have gone ahead with the interview. It must be remembered that Fraine considered himself dependent on the Commonwealth for the benefits of his immunity deal and was already fearful of "Mr. Wise's heavy leaning." *Id.* How better to avoid further government animosity than to refrain from an interview with defense counsel? Delinsky's retraction, it must be remembered, was conveyed not to an individual of equal bargaining power but to an immunized witness falling into that class of persons so subject to governmental suggestion that both the Massachusetts Superior Court and the district courts in this circuit routinely highlight the point for juries. *See* William P. Homans, Jr., *Massachusetts Jury Instructions: Criminal* § 2–5 (Michie 1996); Edward J. Devitt, Charles B. Blackmar, Michael A. Wolff & Kevin F. O'Malley, *Federal Jury Practice and Instructions: Civil and Criminal* § 15.03 (5th ed.2000).

In sum, by clear and convincing evidence, this Court finds that Fraine was dissuaded from engaging in an interview with defense counsel because he continued to feel threatened by Delinsky's first call notwithstanding its later retraction. This governmental interference with Davis' ability to prepare for trial violated his right to due process of law.

### C. *Prejudice*

Noting the potential due process violation, the Massachusetts Appeals Court nevertheless ruled [16] that it was "plain on this record that 'direct access' to Fraine 'would have added only negligibly, if at all, to the defense artillery trained toward trial.'" *Commonwealth v. Davis*, 13 Mass. App.Ct. at 184–85, 431 N.E.2d 251 (quoting *Commonwealth v. St. Pierre*, 377 Mass. 650, 659 [1979]). Sensitive to its own duty, this Court has conducted the most thorough and exhaustive review it can upon the record before it. With the most profound respect to the Massachusetts Appeals Court, this Court cannot conclude that the absence of prejudice is "plain."

In *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the Supreme Court determined that "habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" The Supreme Court's language seemed to assign the burden of proving prejudice to the habeas petitioner. *See* J. Thomas Sullivan, *The "Burden" of Proof in Federal Habeas Litigation*, 26 U.Mem.L.Rev. 205, 231 (Fall 1995). In the subsequent decision of *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995), the Supreme Court clarified *Brecht* by casting the burden analysis in terms of a judge's "grave doubt." Under that analysis, habeas relief is granted to a petitioner when the judge is "in grave doubt as to the harmlessness of an error." *Id.* at 437, 115 S.Ct. 992.[17] Even though the Supreme Court has thus shied away from the assignment of a "burden," per se, on the habeas petitioner, an interpretation of these cases demonstrates that the petitioner must still advance some theory of prejudice arising from the established constitu-

---

**16.** It is important to note that this is a legal ruling by an appellate court on a cold record. Justice Garrity made no such finding, as he concluded there had been no due process violation. In fairness, this Court notes that it too has naught but the bare record, as the evidentiary hearing did not address the issue of prejudice.

**17.** An error is not harmless if it had a "substantial and injurious effect or influence on the jury's verdict." *Brecht*, 507 U.S. at 638, 113 S.Ct. 1710 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 [1946]).

tional violation at trial. *See supra,* at 233–34.

While it is true that defense counsel ably examined Fraine and elicited from him the substance of his grand jury testimony favorable to Davis, Delinsky's unexpected cross examination impeaching Fraine with prior bad acts that told upon his veracity cannot help but to have had an effect. This is all the more so since Lincoln, the government's chief witness, was so clearly an amoral liar pursuing the main chance. Delinsky's effective cross examination of Fraine had the expected and intended effect of reducing Fraine more or less to Lincoln's level. *See* Robert E. Keeton, *Trial Tactics and Methods,* § 3.11 at 114–15 (2d ed.1973) (describing how the success of using bad character evidence to impeach a witness depends upon a trial context influenced by various issues of credibility). Had a jury convicted Davis upon this record, this Court would have grave doubts about whether that error was harmless, and would issue the Great Writ. *See O'Neal,* 513 U.S. at 438, 115 S.Ct. 992.

 Yet this was not a jury case. The same judge who saw, heard, and evaluated the witnesses, convicted Davis after a thorough trial and thereafter denied his motion for a new trial. That judge was in the best position to make the ruling here presented to me. Implicitly, he has done so. In the circumstances of this case, it simply does not stand to reason that Justice Garrity believed that affording pre-trial access to Fraine would have changed the result.[18] Davis thus has not, and cannot, create any

grave doubt in my mind as to the harmlessness of the violation.[19]

## VII. CONCLUSION AND SAFE HARBOR

For all the reasons expressed above, this petition is denied—solely because Davis has failed to demonstrate that he was prejudiced by the Commonwealth's interference with his due process rights.

The Court is aware that this exposition of *Kines v. Butterworth* may have mischievous results, especially here in the federal court where witness immunity is far more liberal and defense discovery far more restrictive. One can imagine a myriad of circumstances where, long after the event, *habeas* petitioners claim their rights to interview government witnesses were chilled by some subtle government cue.

A formal letter issued by the United States Attorney to government witnesses well in advance of trial, informing them of their right to choose whether or not to be interviewed by the defense without governmental let or hindrance would go far to hampering such claims. Indeed, safe harbor would seem assured were the government to offer a deposition of any government witness as to which it perceives such a problem. *See generally* Fed.R.Crim.P. 15; Mass.R.Crim.P. 35.

## VIII. EPILOGUE

This is an "old" case. While much of the delay may be attributed to the Commonwealth's obdurate refusal to face the mer-

---

**18.** This Court recognizes that this conclusion, which distinguishes between jury trials and jury-waived trials, may seem to place a greater amount of faith in the factual findings of a judge sitting as factfinder. Rather, this conclusion reflects this Court's belief that a judge, sitting as fact finder, is capable of determining, upon a review of the entire proceedings, whether an error in the trial would have made a difference to his own factual findings. The jury, which is fundamentally, and for good reasons, a "black box," is not able to advise a reviewing court as to whether an error was prejudicial. Thus, for better or for worse, a criminal defendant who pre-

serves his right to a jury trial stands to benefit from a reviewing court's inability to probe the minds of the jury by being given the benefit of the doubt when trial error may be prejudicial. In contrast, a criminal defendant who waives trial by jury necessarily places a degree of faith in the presiding judge's ability to review issues of prejudice, much as that judge will also consider matters related to suppression of evidence, hearsay, et cetera.

**19.** Davis' subsidiary claims do not warrant discussion.

its, the rights of neither the litigants nor the interests of the public have been served by the seventeen year wait. Ironic as it may seem, however, Davis can console himself that at least he had an evidentiary hearing in federal court and a careful look at the merits. Were his case a "new" case, he could not have even this much, since Congress, mistrustful of the federal district courts, has now stripped me of the power to examine the factual underpinnings of Davis' claim. *See* 28 U.S.C. § 2254(e) (1999).

This petition must be, and hereby is, DISMISSED.